**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED

MAR 28 2017

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. 4:17-CR-116** |
| | § | |
| **STEPHEN E. STOCKMAN,** | § | |
| **JASON T. POSEY** | § | |

## FIRST SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

### COUNTS 1-8
### 18 U.S.C. §§ 1341, 1343, and 2
### (Mail and Wire Fraud)

At all times relevant to this indictment:

### I. The Participants in the Scheme

1.     The defendant STEPHEN E. STOCKMAN was a Member of the United States House of Representatives representing the 36th congressional district of Texas from January 2013 to January 2015.   The 36th congressional district was located, in part, within the Southern District of Texas.   Prior to running for Congress, and while a member of Congress, STOCKMAN obtained hundreds of thousands of dollars in charitable donations by representing to individuals that he was raising funds on behalf of tax-exempt charitable organizations.   In or about

1

early 2014, STOCKMAN campaigned for a political party's nomination for a seat in the United States Senate, but he was defeated in the primary election on or about March 4, 2014.

2.      The defendant JASON T. POSEY worked on STOCKMAN's campaign for Congress in 2012.   From about January 2013 until about November 2013, POSEY served as treasurer of STOCKMAN's congressional campaign committee, Friends of Congressman Steve Stockman.   In that capacity, POSEY was responsible for filing regular reports with the Federal Election Commission ("FEC") on behalf of the campaign.   Additionally, from about January 2013 until about October 2013, POSEY was employed in STOCKMAN's congressional office as director of special projects.

3.      Thomas Dodd, charged elsewhere, was a fundraiser who worked with STOCKMAN on various fundraising ventures beginning no later than in or about January 2010.   Dodd also worked on STOCKMAN's campaign for Congress in 2012.   From about January 2013 until about October 2013, Dodd was employed in STOCKMAN's congressional office as a special assistant.

## II. Background

### A.      Restrictions on Use of Charitable Organizations

4.      In order to promote the public interest in the development and operation of legitimate charitable groups, Section 501(c)(3) of the Internal Revenue Code exempted from taxation non-profit entities organized and operated exclusively for certain charitable, religious, scientific, and educational purposes.   In order to encourage charitable giving, the Internal Revenue Code also granted charitable tax deductions for individual donations to such Section 501(c)(3) charities.   Section 501(c)(3) charities were specifically prohibited from using their net earnings for the purpose of benefitting any private individual, or participating in political campaigns on behalf of any candidate for public office.

**B.**      **The Election Act**

5.      The Federal Election Campaign Act of 1971, as amended, Title 52, United States Code, Sections 30101, *et seq.*, (formerly Title 2, United States Code, Sections 431, *et seq.*) ("Election Act") imposed financial limits in the election of candidates for federal office, including the offices of Member of the United States House of Representatives and United States Senator, and provided for public disclosure of the financing of federal election campaigns as follows:

(a) The Election Act limited the amount and sources of money that may be contributed to a federal candidate or a federal candidate's authorized committee.   In 2012, the Election Act limited campaign

contributions to $2,500 from any one individual to any one candidate in each election—primary, primary run-off, and general. In 2014, the Election Act limited such contributions to $2,600.

(b) The Election Act prohibited a person from making a political contribution in the name of another person, including by giving funds to a straw donor or conduit for the purpose of having the straw donor or conduit pass the funds on to a federal candidate as his or her own contribution.  The Election Act also prohibited a person from knowingly permitting his name to be used to effect such a conduit contribution.

(c) Under the Election Act, individuals and organizations could independently spend unlimited amounts of money to influence federal elections, so long as the expenditures were made independently of a candidate, the candidate's authorized committee, and their agents ("independent expenditures").   However, expenditures by a person or organization in cooperation, consultation, or concert with, or at the request or suggestion of a federal candidate, that candidate's authorized committee, or their agents ("coordinated contributions"), constituted a contribution to

4

such candidate and were subject to the Election Act's contribution limits.

(d) Under the Election Act, corporations were prohibited from making contributions to a candidate for federal office, including Member of the United States House of Representatives and United States Senator.

6. The FEC was an agency of the United States Government entrusted with the responsibility of administering and enforcing the Election Act. In order to deter abuses and instill public confidence in the election process, the FEC was responsible for receiving and making available to the public specific information about the amounts and sources of political contributions to federal candidates and their political committees.

7. Pursuant to the Election Act, the FEC required campaign committees to file periodic reports of receipts and disbursements identifying, among other things, each person who made a contribution to such committee during the relevant reporting period whose contribution or contributions had an aggregate amount or value in excess of $200 within the calendar year, together with the date and the amount of any such contribution. These periodic reports, which were filed with the FEC and made publicly available, were intended to provide the public with a

5

transparent record of all contributions to candidates for federal office.   As such, they constituted the public's only window into the sources of funding for federal election campaigns.

### C.   **STOCKMAN Campaign Organizations**

8.   On or about April 5, 2012, STOCKMAN established his principal campaign committee, Friends of Congressman Steve Stockman, by causing the filing of a statement of organization with the FEC.   Friends of Congressman Steve Stockman was used by STOCKMAN to fund his election for the United States House of Representatives in 2012.   An amended statement of organization filed on or about April 19, 2012, listed the principal address of the committee as P.O. Box 57135, Webster, TX.   Beginning no later than around August 2011, STOCKMAN opened and maintained multiple bank accounts under the names "Stephen E Stockman dba Friends of Steve Stockman," "Stephen E Stockman dba Friends of Congressman Stockman," and "Friends of Steve Stockman."

9.   On or about December 13, 2013, STOCKMAN established another principal campaign committee, Steve Stockman for Senate, by causing the filing of a statement of organization with the FEC.   Steve Stockman for Senate was used by STOCKMAN to fund his campaign for the United States Senate in 2013 and 2014. The statement of organization filed on or about December 13, 2013, listed the

6

principal address of Steve Stockman for Senate as P.O. Box 57135, Webster, TX. Beginning no later than around December 2013, POSEY opened and maintained multiple bank accounts under the name "Jason Posey sole prop dba Steve Stockman for Senate."

### D.    Other Organizations Affiliated With STOCKMAN

10.    Presidential Trust, also known as Presidential Trust Marketing, was an unincorporated business that STOCKMAN created on or about May 19, 2004, by filing a certificate of ownership for unincorporated business or profession with the clerk of Harris County, Texas.  Beginning no later than in or around May 2004, STOCKMAN opened and maintained multiple bank accounts under the name "Steve Stockman dba Presidential Trust."   In financial disclosure forms filed with the United States Congress in 2013, STOCKMAN reported having received $350,000 in "Fees & Salary" from Presidential Trust Marketing.

11.    The Ross Center was an entity incorporated in the State of Texas in or around September 2005.  According to its articles of incorporation, the specific purposes of the Ross Center were to "a) educate individuals on various topics useful to them and beneficial to the community, b) relieve the poor, distressed, and disadvantaged, and c) provide treatment and rehabilitation opportunities for drug addicted individuals."   POSEY was listed as a director of the Ross Center.   In or

7

around January 2006, in a letter addressed to POSEY, the Internal Revenue Service approved the application of the Ross Center for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.   In or around May 2010, the Internal Revenue Service revoked the Ross Center's tax-exempt status as a result of its failure to file a tax return or notice for three consecutive years.   Beginning no later than in or around June 2010, STOCKMAN opened and maintained multiple bank accounts under the name "Stephen E Stockman dba Ross Center."

12.    Life Without Limits was a non-profit entity incorporated in the State of Nevada by an individual unconnected to the scheme in or around April 2011 for the purpose of assisting individuals living through traumatic life events.   In or around November 2011, Life Without Limits received tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.   Although STOCKMAN did not formally control Life Without Limits, in or about February 2012, STOCKMAN filed a certificate of ownership for unincorporated business or profession with the clerk of Harris County, Texas, reporting "Life Without Limits" as his business.   Also beginning in or about February 2012, STOCKMAN opened and maintained multiple bank accounts under the name "Stephen E Stockman dba Life Without Limits" in Friendswood, Texas, within the Southern District of Texas.   On or about October 3, 2013, STOCKMAN caused the filing of an official document naming POSEY as the

8

new president of Life Without Limits.   Beginning in or around January 2014, POSEY opened and maintained multiple bank accounts under the names "Life Without Limits, Inc."

13.    Center for the American Future ("CAF") was an entity incorporated in the State of Texas in or around August 2013.   According to a certificate of formation filed by POSEY on or about August 28, 2013, CAF was a non-profit corporation "organized exclusively for social welfare purposes," namely "to educate voters on issues affecting America's future."   POSEY was the president of CAF, and in that capacity POSEY solicited funds on behalf of CAF for the purposes of making purportedly independent expenditures to influence the 2014 primary election for United States Senator in which STOCKMAN was a candidate.   Beginning no later than in or around December 2013, POSEY opened and maintained multiple bank accounts under the name "Center for the American Future Inc."

### E.    The Victim Charitable Foundations

14.    Foundation A and Foundation A1 were non-profit entities incorporated in the State of Maryland in or around 1982 and 1986, respectively, which made donations to qualifying Section 501(c)(3) charities.   Person A directed donations from both Foundation A and Foundation A1.

15.    Foundation B was a non-profit entity based in Lake Forest, Illinois, which made donations to qualifying Section 501(c)(3) charities.   Person B directed donations from Foundation B.

### III. The Scheme to Defraud

16.    From in or around May 2010 through in or around October 2014, in the Southern District of Texas and elsewhere, the defendants,

**STEPHEN E. STOCKMAN**
**and**
**JASON T. POSEY,**

along with others known and unknown to the grand jury, knowingly devised and intended to devise a scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises.

### A.    The Purpose of the Scheme

17.    The purpose of the scheme was for STOCKMAN, POSEY, and Dodd unlawfully to enrich themselves and to fund their political activities by fraudulently soliciting and receiving hundreds of thousands of dollars in donations from charitable foundations and the individuals who ran those foundations based on false pretenses, then diverting these funds to pay for personal and political expenses and to finance illegal contributions to STOCKMAN's campaigns for federal office.

### B.    The Manner and Means of the Scheme

It was part of the scheme to defraud that:

18.   STOCKMAN,   POSEY,   and   Dodd   repeatedly   made   false representations in soliciting hundreds of thousands of dollars in donations from charitable   foundations   and   the   individuals   who   ran   those   foundations. STOCKMAN, POSEY, and Dodd told these foundations and individuals that their donations would be used for charitable and educational purposes, or for lawful independent political advocacy, and directed donors to send donations to bank accounts that had been opened in the name of purported non-profit organizations.

19.   STOCKMAN, POSEY, and Dodd misused the names and tax-exempt status of purported non-profit organizations in order to convince the victims of the scheme to make large monetary donations.   STOCKMAN, POSEY, and Dodd received the fraudulently obtained funds through wire transfers, the U.S. mail, and interstate commercial carriers such as Federal Express.   STOCKMAN and POSEY routed the fraudulently obtained funds through bank accounts established in the names of the non-profit entities whose identities were used to solicit those funds.

20.   STOCKMAN, POSEY, and Dodd spent the donated funds on a variety of personal expenses.   STOCKMAN, POSEY, and Dodd also used the fraudulently obtained funds to advance STOCKMAN's political career, including by making tens

11

of thousands of dollars in illegal contributions to STOCKMAN's campaigns for public office.

21.     STOCKMAN, POSEY, and Dodd also used the fraudulently obtained proceeds to pay expenses associated with other solicitations, including trips to Africa during which STOCKMAN attempted to secure millions of dollars from African countries and companies operating in those countries.

22.     In order to conceal and cover up the scheme to defraud, STOCKMAN, POSEY, and Dodd knowingly made false statements and representations to the FEC, the charitable donors, and the public.   STOCKMAN and POSEY also attempted to conceal and cover up the scheme by laundering the fraud proceeds through numerous bank accounts they controlled before ultimately spending the funds to benefit themselves, their associates, and STOCKMAN's campaigns.

**C.     Acts in Furtherance of the Scheme**

Fraudulent Solicitations of Person A in 2010 for $285,000

23.     Beginning as early as May 2010, STOCKMAN and Dodd solicited a series of charitable donations from Person A.   At the time of these solicitations, Person A was in his mid-80's and had sole discretion over donations from his charitable foundations.

24.    Knowing that one of Person A's foundations, Foundation A, only made donations to qualifying public charities, STOCKMAN and Dodd used the name of the Ross Center to solicit and accept charitable donations from Foundation A.   In making solicitations in the name of the Ross Center, STOCKMAN caused materially false representations to be made to Person A that Foundation A's money would be used for legitimate charitable or educational purposes, including voter education in locations specified by Person A.   As a result of the fraudulent solicitations, Person A made a total of $285,000 in charitable donations from Foundation A to the Ross Center between about May 2010 and about October 2010.

25.    As part of the scheme, STOCKMAN caused Foundation A's $285,000 in charitable donations to be deposited into bank accounts controlled by STOCKMAN under the names "Steve Stockman dba Ross Center" and "Steve Stockman dba Presidential Trust."   Rather than spending any significant portion of Foundation A's donations on legitimate charitable or educational causes, STOCKMAN diverted tens of thousands of dollars of the donations to pay for a variety of expenditures for the personal and political benefit of STOCKMAN, Dodd, and their associates.

26.     As a result of the material misrepresentations to Person A, Foundation A filed a Form 990-PF, "Return of Private Foundation," with the IRS reflecting $285,000 in charitable donations to the Ross Center for calendar year 2010.

Fraudulent Solicitations of Person A in 2011 and 2012 for $165,000

27.     In late 2011, STOCKMAN began campaigning for a party's nomination for election to the United States House of Representatives for Texas's 36th congressional district.   By December 2011, STOCKMAN had raised little or no money for his congressional campaign, and by the end of March 2012, STOCKMAN's campaign had raised only approximately $3,450, according to campaign filings with the FEC.

28.     From about December 2011 through about July 2012, STOCKMAN and Dodd repeatedly solicited Person A for charitable donations.   In making the solicitations, STOCKMAN and Dodd made materially false representations to Person A that his donations would be used for legitimate charitable or educational purposes.   STOCKMAN and Dodd initially solicited the charitable donations on behalf of the Ross Center.   When it was determined that the Ross Center's Section 501(c)(3) status had been revoked, STOCKMAN and Dodd used the name of another Section 501(c)(3) entity created by an individual unconnected to the scheme, Life Without Limits, to solicit charitable donations from Person A.

14

29.     As a result of STOCKMAN and Dodd's solicitations in the names of the Ross Center and Life Without Limits, and their materially false representations that the money would be used for legitimate charitable or educational expenses, Person A donated $165,000 from Foundation A and Foundation A1 to the Ross Center and Life Without Limits in four payments between about December 2011 and about July 2012.

30.     As part of the scheme, STOCKMAN caused Person A's charitable donations to be deposited into bank accounts he controlled before secretly diverting a significant portion of the donations to finance his congressional campaign. STOCKMAN also used Person A's charitable donations to pay for a variety of expenditures for the personal and political benefit of STOCKMAN, Dodd, and their associates.

31.     As a result of STOCKMAN and Dodd's material misrepresentations to Person A, Foundation A1 filed a Form 990-PF, "Return of Private Foundation," with the IRS reflecting $25,000 in charitable donations to the Ross Center for calendar year 2011 and $40,000 in charitable donations to Life Without Limits for calendar year 2012.   In addition, Foundation A filed a Form 990-PF, "Return of Private Foundation," reflecting $100,000 in charitable donations to Life Without Limits in calendar year 2012.

15

Fraudulent Solicitation of Person B in 2013 for $350,000

32.     On or about January 24, 2013, STOCKMAN and Dodd met with Person B to pitch Person B to make a donation to Life Without Limits for the purported purpose of funding the "Freedom House," a townhouse in Washington, D.C., that would serve as a meeting place, dormitory, and training facility for young people. STOCKMAN and Dodd presented Person B with an 18-page document titled "The Congressional Freedom Foundation Proposal prepared for [Person B] January 24, 2013." This document stated that the "Congressional Freedom Foundation" was "launching a three-pronged strategy to promote the ideas of liberty," by establishing the "Freedom House," the "Congressional Freedom Caucus," and the "Congressional Freedom Foundation Field Training Program."

33.     STOCKMAN and Dodd directed Person B to make his charitable donation payable to Life Without Limits, which they described as a Section 501(c)(3) charity. As a result of the representations made by STOCKMAN and Dodd, Person B caused the issuance of a $350,000 check on behalf of Foundation B, which STOCKMAN caused to be deposited into a bank account opened under the name "Steve Stockman dba Life Without Limits."

34.     Despite representing to Person B that Person B's charitable donation would be used to fund the Freedom House, STOCKMAN did not use any significant

portion of the funds for that purpose. Instead, STOCKMAN secretly diverted Person B's charitable donation to pay for a variety of expenditures for the personal and political benefit of STOCKMAN, POSEY, Dodd, and their associates, including more than $50,000 to pay for expenses associated with STOCKMAN's 2014 Senate campaign; approximately $41,000 to fund months of covert surveillance targeting an individual who STOCKMAN considered to be a potential challenger in a future primary election; approximately $20,000 to support STOCKMAN's brother's book business and to obtain books to send to STOCKMAN's donors; approximately $11,000 to pay for a 30-day in-patient alcoholism treatment program for a female associate of STOCKMAN; and approximately $2,200 to pay for summer camp for STOCKMAN's nephew and the daughter of a family friend.

Unlawful Conduit Contributions Using Charitable Donation

35.   In addition, as part of the scheme, on or about February 10, 2013, STOCKMAN and POSEY caused a portion of Person B's charitable donation to be paid out of the Life Without Limits account via two checks: a $12,500 check made payable to POSEY, and a $12,000 check made payable to Dodd & Associates. POSEY and Dodd deposited these checks into their bank accounts, each of which had a balance of less than $2,000 at the time of the deposits.

36.     On or about February 11, 2013, POSEY and Dodd each wrote three checks to STOCKMAN's congressional campaign committee in the amount of $2,500—the maximum individual contribution allowed by law for each of the elections (primary, primary run-off, and general) in which STOCKMAN had run in 2012.     STOCKMAN and POSEY caused the checks to be deposited into STOCKMAN's campaign account.

37.     In order to conceal and cover up the fact that STOCKMAN had funneled a portion of the fraudulent proceeds into his campaign account through POSEY and Dodd, STOCKMAN caused his campaign to file a report with the FEC falsely attributing the $15,000 in contributions to POSEY's father and Dodd's mother.   Following public scrutiny of this FEC report, STOCKMAN later caused his campaign to file amended reports with the FEC falsely attributing the $15,000 in contributions to POSEY and Dodd themselves.

38.     As part of the scheme and to conceal the misappropriation of Person B's $350,000 charitable donation, on or about May 13, 2014, POSEY, at STOCKMAN's direction, sent an email to Person B's accountant attaching the Section 501(c)(3) designation letter for Life Without Limits and a separate letter on Life Without Limits letterhead from "Jason Posey Executive Director."   The letter, which was addressed to Person B, stated in relevant part, "[Y]our Life Without

Limits achieved remarkable results this year – results I couldn't have achieved without you.   With your financial assistance of $350,000 in February 2013, allowed [*sic*] Life Without Limits, to deliver medical supplies to third world nations and support Freedom House . . . .   Your continued support is crucial to our mission."

39.   As a result of the material misrepresentations made to Person B, Foundation B filed a Form 990-PF, "Return of Private Foundation," with the IRS reflecting $350,000 in charitable donations to Life Without Limits for calendar year 2013.

Fraudulent Solicitation of Person B in 2014 for $450,571.65

40.   In about December 2013, STOCKMAN began campaigning for a political party's nomination for a seat in the United States Senate.   STOCKMAN commissioned the creation of a campaign publication resembling a newspaper that advocated for STOCKMAN and against his opponent in the upcoming Senate primary election.

41.   In order to raise funds for the mass mailing of these "newspapers," STOCKMAN and POSEY developed a plan to solicit over $450,000, purportedly to finance an "independent expenditure" by Center for the American Future, an organization controlled by POSEY.   In reality, however, Center for the American Future's activities were not independent of STOCKMAN or his campaign.

19

42.    As part of the scheme, on or about January 31, 2014, POSEY sent a letter to Person B thanking Person B for pledging funds to support Center for the American Future's purported independent expenditure in support of STOCKMAN's Senate campaign, and asking Person B for an additional donation to fund mailings to "the entire state of Texas."

43.    As part of the scheme, on or about February 3, 2014, POSEY had a telephone conversation with Person B in which POSEY asked Person B for a donation to Center for the American Future to finance a purported independent expenditure in support of STOCKMAN's Senate campaign.

44.    In or around February 2014, POSEY coordinated with two printing companies to print hundreds of thousands of copies of the campaign "newspaper" that had previously been reviewed by STOCKMAN, with minor alterations. POSEY paid for the printing of these "newspapers" with funds from Person B's prior charitable donation of $350,000.

45.    As part of the scheme, STOCKMAN and POSEY coordinated with two direct-mail companies to deliver hundreds of thousands of copies of the "newspaper" to the United States Post Office for distribution to voters.   On or about February 15, 2014, STOCKMAN directed the head of one of the direct-mail companies to send a letter to Person B requesting postage funds.   The letter, which cc'd Center for the

American Future, requested that Person B contribute $450,571.65 to pay for postage for more than 800,000 "newspapers" advocating STOCKMAN's election to the Senate.

46.    As a result of these representations, on or about February 18, 2014, Person B wrote a check in the amount of $450,571.65 made payable to the United States Postmaster to finance the postage for the purported independent expenditure.

47.    In or about February and March 2014, while the "newspaper" was being processed for distribution, STOCKMAN and POSEY jointly supervised the mass-mailing project.   During the same time period, POSEY also remained involved in STOCKMAN's Senate campaign.

48.    In or about late February or early March 2014, STOCKMAN and POSEY met in Webster, Texas, with the direct-mail company head who had sent the letter to Person B.   At this meeting, STOCKMAN and POSEY informed the company head that there would not be any additional mailings, and they instructed the company head to refund the unspent portion of Person B's donation to Center for the American Future.

49.    STOCKMAN was defeated in the Senate primary election held on or about March 4, 2014.   On or about March 14, 2014, at STOCKMAN and POSEY's direction, the direct-mail company head issued a check to Center for the American

21

Future in the amount of $214,718.51, representing a refund of the unspent portion of Person B's donation.   No portion of Person B's donation was returned to him. Over the next several months, POSEY used a substantial portion of the remaining $214,718.51 of Person B's donation to pay debts associated with STOCKMAN's campaign for Senate, and to finance POSEY's personal expenses, including to pay for airfare on a flight departing the United States.

50.    As part of the scheme and to conceal STOCKMAN's involvement in the "newspaper" mass-mailing project, on or about May 13, 2014, POSEY falsely stated in an affidavit submitted to the FEC that Center for the American Future's activities relating to the "newspaper" project "were not conducted in cooperation, consultation, or concert with or at the request or suggestion of Steve Stockman, Stockman for Senate Campaign . . . , or any agent of the Campaign."   POSEY also falsely stated in the affidavit that "[n]either Steve Stockman, the Campaign, nor any agent of the Campaign had any material involvement or substantial discussions with me, the Center or any other officers or agents of the Center" related to Center for the American Future's "newspaper" project.

**D.    The Execution of the Scheme**

51.    On or about January 24, 2013, in the Southern District of Texas and elsewhere, the defendant named below, for the purpose of executing the above-

described scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises, and attempting to do so, knowingly caused to be delivered by mail according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, the following matter:

| COUNT | DATE | MAILING | DEFENDANTS |
|-------|------|---------|------------|
| 1 | 1/24/2013 | $350,000 check from Foundation B dated January 24, 2013, containing memo line "2013 Charitable Contribution," and made payable to Life Without Limits | STEPHEN E. STOCKMAN |

All in violation of Title 18, United States Code, Sections 1341 and 2.

52.     On or about the dates listed below, in the Southern District of Texas and elsewhere, for the purpose of executing the above-described scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises, and attempting to do so, the defendants named below knowingly caused to be delivered by a private and commercial interstate carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, the following matters:

| COUNT | DATE | MAILING | DEFENDANTS |
|-------|------|---------|------------|
| 2 | 4/11/2012 | $15,000 check from Foundation A1 dated April 9, 2012, and made payable to Life Without Limits | STEPHEN E. STOCKMAN |

23

| 3 | 2/17/2014 | Letter from head of direct-mail company to Person B dated February 16, 2014 | STEPHEN E. STOCKMAN and JASON T. POSEY |
| 4 | 2/18/2014 | $450,571.65 check from Person B dated February 18, 2014, and made payable to US Postmaster | STEPHEN E. STOCKMAN and JASON T. POSEY |

All in violation of Title 18, United States Code, Sections 1341 and 2.

53.　　On or about the dates listed below, in the Southern District of Texas and elsewhere, for the purpose of executing the above-described scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises, the defendants named below transmitted and caused to be transmitted by means of wire communication in and affecting interstate commerce, the following writings, signals, and sounds:

| COUNT | DATE | WIRE COMMUNICATION | DEFENDANTS |
| --- | --- | --- | --- |
| 5 | 3/28/2012 | Email from STOCKMAN to Person A's assistant enclosing letter to Person A and IRS letter to Life Without Limits | STEPHEN E. STOCKMAN |
| 6 | 5/13/2012 | Email from STOCKMAN to Dodd with subject line "stan" | STEPHEN E. STOCKMAN |
| 7 | 7/2/2012 | $100,000 wire transfer from Foundation A to Steve Stockman dba Life Without Limits account | STEPHEN E. STOCKMAN |
| 8 | 5/13/2014 | Email from POSEY to Person B's accountant attaching letter concerning $350,000 donation | STEPHEN E. STOCKMAN and JASON T. POSEY |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 9
### 18 U.S.C. § 371
### (Conspiracy to Make Conduit Contributions and False Statements)

54.     The allegations contained in paragraphs 1 through 53 of this First Superseding Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

### The Conspiracy and its Objects

55.     From in or about January 2013 to in or about April 2014, in the Southern District of Texas and elsewhere, the defendants,

### STEPHEN E. STOCKMAN
### and
### JASON T. POSEY,

did knowingly conspire and agree with each other, and others known and unknown to the grand jury, to commit the following offenses against the United States:

a.     To knowingly and willfully make contributions to a candidate for federal office in the names of other persons, aggregating to more than $10,000 in a calendar year, in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(D) (formerly codified as Title 2, United States Code, Sections 441f and 437g(d)(1)(D)); and

b.     To knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the

Federal Election Commission, a department or agency of the United States government, in violation of Title 18, United States Code, Section 1001(a)(2).

Acts in Furtherance of the Conspiracy

56.    In furtherance of the conspiracy described in Count 9 and to effect the objects thereof, the defendants named therein and other persons both known and unknown, performed or caused the performance of one or more of the following overt acts, among others not described herein, in the Southern District of Texas and elsewhere on or about the following dates:

a.   On or about February 10, 2013, STOCKMAN caused the issuance of check #1004 payable to Dodd & Associates in the amount of $12,000 from the "Steve Stockman dba Life Without Limits" account.

b.   On or about February 10, 2013, STOCKMAN caused the issuance of check #1007 payable to POSEY in the amount of $12,500 from the "Steve Stockman dba Life Without Limits" account.

c.   On or about February 11, 2013, Dodd deposited into Wells Fargo Bank account xxxx0475, check #1004 drawn on the account "Steve Stockman dba Life Without Limits" payable to Dodd & Associates in the amount of $12,000.

d. On or about February 11, 2013, POSEY deposited in Bank of America account xxxx0954, check #1007 drawn on the account "Steve Stockman dba Life Without Limits" payable to POSEY in the amount of $12,500.

e. On or about February 11, 2013, Dodd issued three checks drawn on Wells Fargo Bank account xxxx4963 each in the amount of $2,500 and payable to STOCKMAN's principal campaign committee.

f. On or about February 11, 2013, POSEY issued three checks drawn on Bank of America account xxxx0954, each in the amount of $2,500 payable to STOCKMAN's principal campaign committee.

g. On or about February 12, 2013, Dodd transferred $8,000 from Wells Fargo Bank account xxxx0475 to Wells Fargo Bank account xxxx4963.

h. On or about February 12, 2013, STOCKMAN and POSEY caused the deposit of $15,000 into Wells Fargo account xxx3374, the account of his principal campaign committee, which deposit was comprised of the six checks written to his campaign by Dodd and POSEY.

i.  On or about March 27, 2013, POSEY and Dodd exchanged emails with the STOCKMAN campaign accountant about reporting their contributions in the names of their parents.

j.  On or about April 15, 2013, STOCKMAN and POSEY caused the electronic submission of a Report of Receipts and Disbursements for STOCKMAN's principal campaign committee, which falsely reported the names of contributors;

k.  On or about October 15, 2013, the STOCKMAN campaign accountant sent STOCKMAN several emails containing drafts of an explanatory note to be included in the campaign's amended Report of Receipts and Disbursements;

l.  On or about October 16, 2013, STOCKMAN and POSEY caused the electronic submission of an amended Report of Receipts and Disbursements for STOCKMAN's principal campaign committee, which falsely reported the names of contributors; and

m. On or about October 19, 2013, STOCKMAN and POSEY caused the electronic submission of an amended Report of Receipts and Disbursements for STOCKMAN's principal campaign committee, which falsely reported the names of contributors.

28

All in violation of Title 18, United States Code, Section 371.

## COUNT 10
## 18 U.S.C. § 1001(a)(2)
## (False Statements)

57.     The allegations contained in paragraphs 1 through 56 of this First Superseding Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

58.     On or about October 16, 2013, in the Southern District of Texas and elsewhere, in a matter within the jurisdiction of the Federal Election Commission, a department and agency of the United States Government, the defendants,

### STEPHEN E. STOCKMAN
### and
### JASON T. POSEY,

aided and abetted by each other, knowingly and willfully caused the submission of a materially false, fictitious, and fraudulent statement and representation, in that the defendants caused STOCKMAN's congressional campaign committee to file a materially false amended quarterly report with the Federal Election Commission, which falsely stated that POSEY and Dodd had contributed $7,500 each to the committee when, in truth and in fact, and as the defendants well knew, the contributions were made using funds provided to POSEY and Dodd by STOCKMAN, who in turn fraudulently obtained the funds from Person B and Foundation B.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT 11
### 18 U.S.C. § 1001(a)(2)
### (False Statements)

59.    The allegations contained in paragraphs 1 through 58 of this First Superseding Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

60.    On or about October 19, 2013, in the Southern District of Texas and elsewhere, in a matter within the jurisdiction of the Federal Election Commission, a department and agency of the United States Government, the defendants,

### STEPHEN E. STOCKMAN
### and
### JASON T. POSEY,

aided and abetted by each other, knowingly and willfully caused the submission of a materially false, fictitious, and fraudulent statement and representation, in that the defendants caused STOCKMAN's congressional campaign committee to file a materially false amended quarterly report with the Federal Election Commission, which falsely stated that POSEY and Dodd had contributed $7,500 each to the committee when, in truth and in fact, and as the defendants well knew, the contributions were made using funds provided to POSEY and Dodd by STOCKMAN, who in turn fraudulently obtained the funds from Person B and Foundation B.

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT 12
## 52 U.S.C. §§ 30116(a)(1)(A), 30116(a)(7)(B)(i), and 30109(d)(1)(A)(i) and 18 U.S.C. § 2
### (Making Excessive Contributions)

61.     The allegations contained in paragraphs 1 through 60 of this First Superseding Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

62.     In or about February 2014, in the Southern District of Texas and elsewhere, the defendants,

### STEPHEN E. STOCKMAN
### and
### JASON T. POSEY,

aided and abetted by each other, knowingly and willfully made and caused to be made contributions to STOCKMAN's Senate campaign committee in excess of the limits of the Election Act, which aggregated $25,000 and more in calendar year 2014, and did so by making and causing coordinated expenditure contributions by Center for the American Future to STOCKMAN's principal campaign committee in the form of expenditures by Center for the American Future for specific advertising advocating for STOCKMAN's election and attacking STOCKMAN's opponent, which expenditures were made in cooperation, consultation, and concert, with, and at the request and suggestion of, STOCKMAN, his authorized political committee,

34

and their agents.

All in violation of Title 52, United States Code, Sections 30116(a)(1)(A), 30116(a)(7)(B)(i), and 30109(d)(1)(A)(i) (formerly codified as Title 2, United States Code, Sections 441a(a)(1)(A), 441a(a)(7)(B)(i), and 437g(d)(1)(A)(i)), and Title 18, United States Code, Section 2.

## COUNT 13
## 18 U.S.C § 1519
## (Falsification of Records)

63.     The allegations contained in paragraphs 1 through 62 of this First Superseding Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

64.     On or about May 13, 2014, in the Southern District of Texas and elsewhere, the defendant,

### JASON T. POSEY,

with intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry in a record, document, and tangible object, to wit, falsely swearing in an affidavit that the "newspaper" mailed by the Center for the American Future in connection with STOCKMAN's 2014 Senate campaign was not produced in cooperation, consultation, or concert with STOCKMAN and that STOCKMAN had no substantial discussions with POSEY regarding the "newspaper," which falsification POSEY well knew and contemplated was in relation to the proper investigation and administration of a complaint pending with the FEC.

36

All in violation of Title 18, United States Code, Section 1519.

  
# COUNTS 14-15
## 18 U.S.C. § 1957
## (Money Laundering)

65.     The allegations contained in paragraphs 1 through 64 of this First Superseding Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

66.     On or about the following dates, in the Southern District of Texas and elsewhere, the defendants named below, did knowingly cause and engage in, and attempt to cause and engage in, monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, such funds having been derived from specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343.

| COUNT | DATE | MONETARY TRANSACTION | DEFENDANT |
|-------|------|----------------------|-----------|
| 14 | July 3, 2012 | Transfer of $15,000 from Life Without Limits Wells Fargo Bank acct xxx2178 to Friends of Steve Stockman Wells Fargo Bank account xxx2171. | STEPHEN E. STOCKMAN |
| 15 | July 24, 2012 | Transfer of $27,000 from Life Without Limits Wells Fargo Bank acct xxx2178 to Friends of Steve Stockman Wells Fargo Bank account xxx2171. | STEPHEN E. STOCKMAN |

All in violation of Title 18, United States Code, Sections 1957 and 2.

# COUNTS 16-26
## 18 U.S.C. § 1957
## (Money Laundering)

67.     The allegations contained in paragraphs 1 through 66 of this First Superseding Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

68.     On or about the following dates, in the Southern District of Texas and elsewhere, the defendants named below, did knowingly cause and engage in, and attempt to cause and engage in, monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, such funds having been derived from specified unlawful activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341.

| COUNT | DATE | MONETARY TRANSACTION | DEFENDANTS |
|-------|------|----------------------|------------|
| 16 | February 12, 2013 | Deposit of Life Without Limits check #3001 drawn on Wells Fargo Bank account xxx2178 in the amount of $13,000 into the Community Bank of Texas, N.A. | STEPHEN E. STOCKMAN |
| 17 | February 12, 2013 | Deposit of Life Without Limits check #3002 drawn on Wells Fargo Bank account xxx2178 in the amount of $13,000 into the Community Bank of Texas, N.A. | STEPHEN E. STOCKMAN |
| 18 | February 19, 2013 | Transfer of $65,000 from Life Without Limits Wells Fargo Bank account xxx2178 to Life Without Limits Wells Fargo Bank account xxx5346. | STEPHEN E. STOCKMAN |
| 19 | October 16, 2013 | Deposit of $11,000 cashier's check from Wells Fargo Bank into an account at Texas First Bank | STEPHEN E. STOCKMAN |

| 20 | January 31, 2014 | Deposit of $57,356.65 into Wells Fargo Bank account xxx3556, which was part of the proceeds from Life Without Limits check #1024 drawn on Wells Fargo Bank account xxx2178. | STEPHEN E. STOCKMAN |
| 21 | January 31, 2014 | Deposit of $57,356.65 into Wells Fargo Bank account xxx7634, which was part of the proceeds from Life Without Limits check #1024 drawn on Wells Fargo Bank account xxx2178. | STEPHEN E. STOCKMAN |
| 22 | March 14, 2014 | Deposit of Amegy Bank check 022304 in the amount of $214,718.51 into Bank of America account xxx7956 held in the name Center for the American Future, Inc. | STEPHEN E. STOCKMAN and JASON T. POSEY |
| 23 | March 21, 2014 | Transfer of $134,355.29 from Center for the American Future, Inc.'s Bank of America account xxx7956 to Jason Posey's Bank of America account xxx0954 | JASON T. POSEY |
| 24 | March 24, 2014 | Withdrawal of $17,010 from Center for the American Future, Inc.'s Bank of America account xxx7956 to purchase a cashier's check in the amount of $17,000 | STEPHEN E. STOCKMAN and JASON T. POSEY |
| 25 | March 24, 2014 | Withdrawal of $116,365.29 from Jason Posey's Bank of America account xxx0954 to purchase cashier's check 1568800046 payable to Life Without Limits in the amount of $116,355.29 | JASON T. POSEY |
| 26 | March 24, 2014 | Deposit into Life Without Limits, Inc. Wells Fargo Bank account xxx3556 cashier's check 1568800046 payable in the amount of $116,355.29 | JASON T. POSEY |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT 27
## 18 U.S.C. § 1956(a)(1)(B)(i)
## (Money Laundering)

69.     The allegations contained in paragraphs 1 through 68 of this First Superseding Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

70.     On or about the following dates, in the Southern District of Texas and elsewhere, the defendants named below, did knowingly conduct and attempt to conduct the financial transactions described below, affecting interstate commerce, which involved the proceeds of a specified unlawful activity, that is, mail fraud, a violation of Title 18, United States Code, Section 1341, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, represented the proceeds of some form of unlawful activity.

| COUNT | DATE | TRANSACTION DESCRIPTION | DEFENDANT |
|---|---|---|---|
| 27 | March 24, 2014 | Deposit into Steve Stockman for Senate Bank of America account xxx9516 cashier's check 1055400159 payable in the amount of $17,000 | STEPHEN E. STOCKMAN and JASON T. POSEY |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

41

and 2.

## COUNT 28
## 26 U.S.C. § 7206(1)
### (Filing False Return)

71.     The allegations contained in paragraphs 1 through 70 of this First Superseding Indictment are hereby repeated, realleged, and incorporated by reference as though fully set forth herein.

72.     On or about April 14, 2014, in the Southern District of Texas and elsewhere, the defendant,

**STEPHEN E. STOCKMAN,**

did willfully make and subscribe, and cause to be made and subscribed, a 2013 U.S. joint Individual Income Tax Return, IRS Form 1040, which was verified by a written declaration that the return was made under penalties of perjury, and which he did not believe to be true and correct as to every material matter, in that the return, which was prepared and signed in the Southern District of Texas and was filed with the IRS, reported his total income on Line 22 of Form 1040 as $269,105, when, as he then and there knew and believed, his total income was greater than reported.

All in violation of Title 26, United States Code, Section 7206(1) and Title 18, United States Code, Section 2.

## NOTICE OF FORFEITURE
## 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C)

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United

States Code, Section 981(a)(1)(C), the United States gives notice to defendants,

## STEPHEN E. STOCKMAN
## and
## JASON T. POSEY,

that in the event of their conviction of any of the offenses charged in Counts One

through Eight of this First Superseding Indictment, all property, real or personal,

which constitutes or is derived from proceeds traceable to such offense, is subject to

forfeiture.


## NOTICE OF FORFEITURE
## 18 U.S.C. § 982(a)(1)

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States

gives notice to defendants,

## STEPHEN E. STOCKMAN
## and
## JASON T. POSEY,

that upon conviction of any of offenses charged in Counts Fourteen through Twenty-

Seven of this First Superseding Indictment, all property, real or personal, involved

in money laundering offenses or traceable to such property, is subject to forfeiture.

44

## **Money Judgment**

Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, for which the defendants may be jointly and severally liable.

## **Substitute Assets**

Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of defendants,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture pursuant to Title 21, United States

Code, Section 853(p), as incorporated by reference in Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON                                   DATE   March, 28, 2017

ABE MARTINEZ
Acting United States Attorney

MELISSA ANNIS
Assistant United States Attorney

RAYMOND N. HULSER
Chief, Public Integrity Section

RYAN J. ELLERSICK
ROBERT J. HEBERLE
Trial Attorneys