1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3

4     UNITED STATES OF AMERICA      .    4:17-CR-00116-2

5     VERSUS                        .    HOUSTON, TEXAS

6     STEPHEN E. STOCKMAN           .    DECEMBER 1, 2017

7     . . . . . . . . . . . . . .   9:26 A.M.

8

9             TRANSCRIPT OF INTERIM PRETRIAL CONFERENCE
               BEFORE THE HONORABLE LEE H. ROSENTHAL
10               CHIEF UNITED STATES DISTRICT JUDGE

11

12

13                          *APPEARANCES*

14

15

16    FOR THE GOVERNMENT:

17         Melissa J. Annis
           Assistant United States Attorney
18         1000 Louisiana
           Suite 2300
19         Houston, Texas  77002

20         Robert J. Heberle
           Ryan J. Ellersick
21         UNITED STATES DEPARTMENT OF JUSTICE
           1400 New York Avenue Northwest
22         Suite 12000
           Washington, DC  20005

23

24

25

1                              *APPEARANCES CONTINUED*

2

3

4    FOR THE DEFENDANT:

5            Sean R. Buckley
             Attorney at Law
6            770 South Post Oak Lane
             Suite 620
7            Houston, Texas   77056

8

9            Gary Tabakman
             Attorney at Law
10           712 Main Street
             Suite 2400
11           Houston, Texas   77002

12   OFFICIAL COURT REPORTER:

13
             Mayra Malone, CSR, RMR, CRR
14           U.S. Courthouse
             515 Rusk, Room 8004
15           Houston, Texas   77002

16

17   Proceedings recorded by mechanical stenography.   Transcript
     produced by computer-aided transcription.
18

19                                - - - - -

20

21

22

23

24

25

1                            *PROCEEDINGS*

2              THE COURT:  Go ahead and state your appearances,

3        please.

4              MR. HEBERLE:  Good morning, Your Honor.  Robert

09:26   5        Heberle, Ryan Ellersick and Melissa Annis for the United

6        States.

7              MR. TABAKMAN:  Gary Tabakman and Sean Buckley for

8        Mr. Stockman.

9              THE COURT:  Let's take up the motions to dismiss and

09:27  10        then we can deal with the proposed jury questionnaire.

11                   Did you get the proposed edits?

12              MR. BUCKLEY:  I did, Your Honor.

13              THE COURT:  Both sides got them, my edits?

14              MR. BUCKLEY:  I don't know if I did, Your Honor.  I'm

09:27  15        sorry.

16              THE COURT:  You need to make copies of them and give

17        one to the lawyers.  Have Lisa do that.  Lisa, go ahead and do

18        that.

19          *(Off the record discussion held)*

09:27  20              THE COURT:  All right.  Let's deal with the motion to

21        dismiss while we are getting that.  I don't have many changes,

22        but I have some suggested revisions to make it a little easier

23        to follow.  I don't have any objection to the expanded

24        questionnaire.

09:27  25              MR. BUCKLEY:  If I may inquire of the Court, the only

09:27   1   concern I have from the expanded questionnaire, of course, is

2   the volume of material that would be coming back to us if we

3   were receiving the questionnaire that morning.

4           THE COURT:  I'm not going to impose that.  That is

09:28   5   unrealistic.

6           MR. BUCKLEY:  Okay.

7           THE COURT:  We will try to get them the day before and

8   see if we can maneuver it that way and try to get them without

9   having the entire panel have to come down here just to hand in

09:28   10  a paper and then go home.  That doesn't make sense.

11          MR. BUCKLEY:  Thank you, Your Honor.

12          THE COURT:  So we will work through those logistics.

13          MR. HEBERLE:  Yes, Your Honor.

14          THE COURT:  All right.  Okay.  So it's your motion.

09:28   15  Do you want to speak to it?

16          MR. BUCKLEY:  Yes, Your Honor.  Thank you.  The first

17  motion to dismiss relates to Counts One through Eight, and

18  although we have, as the Court is aware --

19          *(Off the record discussion held)*

09:28   20          MR. BUCKLEY:  As the Court is aware, we have gone

21  through a lengthy analysis in both the initial motion and then

22  our reply to the government's response in opposition.  So I

23  will -- without belaboring the litany of what we have argued, I

24  will summarize what I think the gist of our argument is.

09:29   25          As to the motion to dismiss Counts One through

09:29    1    Eight, our contention is that when viewed in the context of

2    the 7(c)(1) requirements of pleading for fraud cases and also

3    in light of the higher standard for pleading fraud that we see

4    as derived from Telemarketing Associates, which was a civil

09:29    5    case but it was a fraud accusation, that we believe that the

6    indictment, although it may be sufficient under a different

7    type of case, in the case of specific fraudulent

8    misrepresentations, that there is a failure of the indictment

9    to allege specifically that Mr. Stockman made a representation

09:29   10    that at the time he made the representation, he had a specific

11    intent to deceive the person who received that solicitation.

12                Now, what I think the indictment attempts to do,

13    which also relates to some degree to our motion to strike

14    surplusage, is that it attempts to cast the separate

09:30   15    allegations of fraud within the indictment as part of an

16    overarching scheme that occurs over a long period of time.  And

17    the mechanism in that case would be to impute an intent to

18    defraud, an intent to scheme as to the individual allegations

19    in Counts One through Eight.  And our contention is that that

09:30   20    is not sufficient under 7(c)(1) for fraud cases.

21                For example, the Yefsky case out of the Fifth

22    Circuit does articulate a higher standard for fraud pleadings

23    and in light of Telemarketing Associates.  And for the Court's

24    reference, I note that there has been a difference in the way

09:30   25    that we have cited the case, Telemarking Associates.  It is

1  cited by the government and also the Lyons case out of

2  California, as the Madigan case.  Madigan, of course, was the

3  Attorney General for the state of Illinois who prosecuted the

4  Telemarketing Associates case.  So that is the same case that

5  we are each citing using different citations.

6          The government has also with regard to the

7  pleading standard imposed by Telemarketing Associates cited and

8  drawn the Court's attention to the Lyons case out in

9  California, which was also a case involving telemarketers.

10          We believe that the cases can be distinguished

11  from Mr. Stockman's indictment because in the Lyons case, the

12  indictment was specific and did contain specific allegations of

13  an intent to deceive at the time of the solicitations.

14          And I would draw the Court's attention and

15  conclusion to that particular motion to dismiss to a couple

16  other distinctions factually even derived from the face of the

17  indictment.

18          In a telemarketing case, the essence of the fraud

19  is that you have a telemarketing program that is ongoing and is

20  in effect like a rolling scroll of activity.  And in the course

21  of that rolling scroll of activity, you can see -- the people

22  who are operating the telemarketing or the charitable

23  solicitation can see what percentage in realtime of these -- so

24  the donations are actually going to various different purposes,

25  including overhead or telemarketing services, for example.  And

09:32    1   that was the essence of the misrepresentation is that, for

         2   example, you know, I'm calling someone on the phone and I say,

         3   hey, a significant portion of what you donate will go to the

         4   charitable cause.

09:32    5        And at that time, the people making the calls,

         6   the people responsible for that telemarketing scheme would know

         7   whether that was a correct assertion or not.  And in the

         8   government's indictment of Mr. Stockman, there is no indication

         9   that any of the expenditures that the government claims were

09:33   10   not in conformity with the solicitation could ever have been

        11   known by Mr. Stockman at the time he made the solicitation.

        12        The other, I think, distinguishing difference is

        13   that in a telemarketing case, you're dealing with someone on

        14   the other end who is receiving a solicitation who is

09:33   15   potentially only sophisticated enough to know how to answer a

        16   phone and talk to someone on the phone.  And in this case, in

        17   Mr. Stockman's case, even by the face of the indictment, we're

        18   dealing with sophisticated, self-made, successful businessmen

        19   who run charitable foundations.  Even within the context of the

09:34   20   Schaumburg trilogy and Telemarketing Associates, the Supreme

        21   Court has noted that sophisticated donors are held to -- I

        22   don't know if I'm using the right term "held to," but there is

        23   a different set of concerns, and they have a lesser concern

        24   with regard to the state's or the government's need to police,

09:34   25   prevent, punish fraud for these types of donors.

09:34   1        So I would say that with respect to the type of

2   allegations and the type of individual who is involved here,

3   the government has less of an interest and the First Amendment

4   interest in having these communications would likewise

09:34   5   correspondingly be higher.

6        Moving on to Counts Nine through Eleven, the

7   essence of this is that our complaint for all of these counts

8   stems from what we believe to be the government's failure to

9   allege that at the time of this alleged Conduit contribution

09:35   10   that Mr. Stockman gave money to Mr. Posey and Mr. Dodd for the

11   alleged purpose of making a Conduit contribution.

12        We believe that the explicit absence of that

13   allegation in the indictment is fatal to Count Nine and that

14   the derivative effect on Counts Ten and Eleven would be fatal

09:35   15   to those counts because, of course, the reporting requirements

16   are derived from the source of the funds.

17        Count Twelve is -- frankly, it was hard enough

18   for me to get down on paper and understand what I wrote.  It is

19   even more difficult for me to try to articulate it verbally

09:35   20   except I will say that what seems to be the problem here is

21   that the government has alleged in the indictment, on the face

22   of the indictment a solicitation by Mr. Stockman for an

23   independent expenditure and then a fraudulent conversion of

24   that funds -- those funds to a coordinated expenditure.

09:36   25        And we think that on the face of the indictment,

based on the vagueness of the statute, taking into account the SEC's regulatory scheme and case law from the Fifth Circuit and the Supreme Court addressing a limiting construction to statutes that regulate speech like this but do not specifically employ a term "express advocacy," that without that limiting construction, any kind of regulation of that type of speech rules afoul of the First Amendment.

And, secondly, I think the main point of contention between us and the government seems to be that the government in its indictment has alleged in particular that the newspaper involved in Count Twelve constituted express advocacy.  And we believe that the government must be held to prove that standard that they have alleged, or that fact that they have alleged, and that the face of the newspaper, which is integrated into the indictment by reference and made available to us through discovery, negates on its face the idea of express advocacy.  So we believe that that count must fail as a matter of law.

Regarding the motions to dismiss Fourteen through Twenty-two, Twenty-four and Twenty-seven, these are the money-laundering counts.  And Count Twenty-seven, the last of these, is the only count as far as I'm aware that relates to 18 United States Code 1956.  The other counts relate to 1957, which, as the government correctly points out, is the spending money laundering statute as opposed to the concealing one.

09:38  1           And so to the degree that the additional language

2     in 1956 may cure some of the complaints that we have about the

3     1957 allegations, I recognize that possibility without

4     conceding it.  But as to the 1957 allegations, our beef is

09:38  5     essentially structurally that if you have, particularly in the

6     context of a charitable solicitation operation, a -- somehow a

7     finding that some fraud has been affected or taken place within

8     the context of this charitable solicitation, but

9     notwithstanding that, that charitable donations came into the

09:39  10    organization and then donations were either used to fulfill the

11    intent of the donors or to engage in other legitimate First

12    Amendment activity consistent with the purpose of the

13    charitable organization, that that would seemingly be, as

14    applied, an infringement of First Amendment rights to then

09:39  15    punish those monetary transactions as part of a

16    money-laundering scheme.  And that's the gist of our argument

17    there.

18           I agree with the government that there seems to

19    be no authority for this proposition.  I haven't found any.

09:39  20    The government has pointed out that I haven't proposed a

21    solution to it.

22           At the same time, I don't think it is

23    Mr. Stockman's job to come up with a way that he can be charged

24    under the money laundering statute.  So I do think -- and I'm

09:39  25    not -- this is not a First Amendment over-breadth challenge

09:39 1 where I have not said I'm finding some conceivable way that the

2 money laundering statute violates First Amendment rights, so,

3 therefore, the whole thing should be invalidated.  I'm not

4 saying that as all.  This is an applied challenge in this

09:40 5 particular case to these particular circumstances.

6              Regarding our motion to strike surplusage --

7         THE COURT:  Why don't we take up the dismissal motion

8 first?

9         MR. BUCKLEY:  Yes, Your Honor.

09:40 10        THE COURT:  Unless they are so closely related that --

11        MR. BUCKLEY:  Yes.  And I believe that those are

12 the -- I think I have completed the various dismissal motions

13 unless I omitted one.

14        THE COURT:  I think that's correct.

09:40 15        MR. BUCKLEY:  There is one other point I forgot to

16 make with regard to One through Eight.

17        THE COURT:  All right.

18        MR. BUCKLEY:  If I may have a moment, Your Honor.

19        THE COURT:  That's fine.

09:41 20    *(Pause)*

21        MR. BUCKLEY:  I don't recall what it was, so I will

22 conclude that with, Your Honor, with regards to the motions to

23 dismiss.

24        THE COURT:  Thank you.

09:41 25        MR. HEBERLE:  Your Honor, we divided responsibility

09:41   1   for the various motions to dismiss, so what we would like to

2   do, if this is acceptable to the Court, is each of us can

3   address the motions that we specialized in.

4          THE COURT:  That's fine.

09:41   5          MR. HEBERLE:  And I will begin with the motion to

6   dismiss the fraud counts, Counts One through Eight.

7          Defense counsel has relied heavily on the

8   Telemarketing Associates or Madigan case, and I think it is

9   important for the Court to note both in that case and in all

09:41   10   the cases that preceded it, which dealt with prophylactic

11   statutes that capped the amount of funds raised that can go to

12   legitimate overhead expenses, that there is a corridor opened

13   for fraud actions.  That the First Amendment, although it does

14   protect legitimate charitable solicitation, provides --

09:41   15   emphatically provides no protection whatsoever for fraudulent

16   misrepresentations designed to convince someone to donate to a

17   charity that is, in fact, a sham.

18          Because the indictment here asserts such a

19   scheme, there is no First Amendment protection for it.  I think

09:42   20   that that is what the Ninth Circuit held in the Lyons case,

21   which dealt with a scheme that is very similar to that alleged

22   here.  That is, a scheme in which the charities were set up not

23   for the purpose of engaging in legitimate charitable activity

24   but rather for the purpose of lining the defendant's pockets.

09:42   25          The indictment here is hardly a barebones

indictment.  It is 46 pages long.  The fraud scheme itself is alleged in approximately 35 paragraphs.  It is not just a recitation of the elements of the offense.  It's the purpose of the scheme, the manner and means of the scheme.  It is four specific occasions in which the defendant went to donors and misrepresented what he was going to do with their money and then almost immediately started diverting that money for other purposes.  So because that fraud action has been alleged in detail, it not only has no First Amendment protection in this case, it also provides sufficient notice to the defendant and is sufficient under the pleading standards of the federal rules.

          I just want to respond to a couple of particular comments that Mr. Buckley made.  Mr. Buckley seemed to suggest that there is no allegation in the indictment that the defendant ever made a knowingly false statement.  That is, that he said something and at the time he said it, he intended to divert the money.  To the contrary, the indictment repeatedly states that the defendant misrepresented things; that he used false pretenses in his solicitations.

          The purpose of the scheme, paragraph 17 in the indictment, states that the purpose of the scheme was for the defendant and his codefendants unlawfully to enrich themselves and to fund their political activities by fraudulently soliciting and receiving hundreds of thousands of dollars in

donations from charitable foundations based on false pretenses.

The manner and means of the scheme, paragraph 18, says the defendant repeatedly made false representations in soliciting hundreds of thousands of dollars in donations from charitable foundations and the individuals who ran those foundations.  And so repeatedly -- and this occurs again when the specific occasions are described in which the defendant went to donors.  The defendant went to donors and made false representations.  He lied about how he was going to spend the money.  He took the money and then he, in fact, did divert the money.  So this case is not just about diversion of funds.  It is about fraudulent misrepresentations, and that's exactly the kind of thing that has no First Amendment protection whatsoever under the Madigan case.

I also understand defense counsel to be saying under Schaumburg, Munson and Riley, there is some sort of heightened pleading standard when a defendant is dealing with a sophisticated donor.  I don't remember any discussion of that sort of heightened pleading requirement in those cases.  Even if that is the case here, the detailed indictment, the extremely detailed allegations regarding each of these solicitations that was made and what happened to the funds would more than clear that hurdle.  And so that would be our response on the motion to dismiss the fraud counts, unless the Court has any further questions.

09:45   1          What we would like to do, Your Honor, is

2    Ms. Annis will go ahead and speak to the Court on Counts Nine

3    through Eleven.

4          THE COURT:  Before Ms. Annis gets up, is there any

09:45   5    response you want to make to the arguments you just heard?

6          MR. BUCKLEY:  Thank you, Your Honor.  Yes.

7          The government, Mr. Heberle, distinguishes

8    correctly between the Schaumburg trilogy and Telemarketing

9    Associates in the sense that the Schaumburg trilogy addressed

09:45   10   prophylactic measures regulating telephone or other

11   solicitations, while the Telemarketing Associates case was a

12   fraud action.  However, Justice Ginsburg, who wrote

13   Telemarketing Associates, pointed out and stated in that

14   opinion that a bare allegation of fraud does not carry the day.

09:46   15   I think I'm paraphrasing her.  Bare allegations of fraud cannot

16   carry the day.

17          Our contention is that Telemarketing Associates

18   sets forth a pleading standard, not simply an open -- gaping

19   open window that if you allege fraud in a one-dimensional or

09:46   20   even two-dimensional sense, that that gives you cart blanche as

21   the government to go in and put any defendant in the position

22   of having to defend himself against the allegations.

23          And that does relate in some sense to one of the

24   regulatory schemes that was addressed.  I don't recall which

09:46   25   case it was in the Schaumburg trilogy, but the Supreme Court

09:47  1    noted that putting a defendant, even in a civil matter, in the

2    position of having to defend themselves in order to make the

3    speech requires even speech that was not otherwise required,

4    which is a regulation on speech or may chill speech

09:47  5    unconstitutional.

6              So another point that Mr. Heberle brought up was

7    the length of the indictment and the -- I think the

8    thoroughness of it in addressing the allegations, with the

9    argument, as I understood it, that that lengthy indictment must

09:47  10   surely encompass all of the intent to defraud and the

11   explanation underlying the intent to defraud that would both

12   properly charge Mr. Stockman and put us on notice of what was

13   charged.  But I think that there is a difference certainly

14   between an indictment that is voluminous and -- pardon me; I

09:48  15   had a brain freeze -- that is both voluminous and sufficient as

16   to each individual count.  And an indictment like this one

17   which just because of the sheer number of allegations it makes

18   may appear to be more sufficient cumulatively, and I believe

19   that it is not.

09:48  20             With regard to whether this fraudulent scheme

21   that is being alleged by the government is explicit enough to

22   impute, which as I understand what is being done to impute or

23   infuse an allegation of specific intent to defraud into each of

24   these misrepresentations or false pretenses that are stated in

09:48  25   the indictment is what we disagree with.

09:49    1              We believe that as to each of the false

2    statements or misrepresentations, there needs to be an explicit

3    allegation that Mr. Stockman knew or intended at the time of

4    those solicitations, that the solicitation was false or

09:49    5    fraudulent, a specific intent to defraud or deceive.  We

6    believe that that should not be imputed by this blanket

7    allegation of a fraudulent scheme, which is, we think, an

8    artificial construct in this case, and it should be more

9    specific.

09:49   10              Thank you.

11              THE COURT:  Anything further?

12              MR. HEBERLE:  Your Honor, I would just briefly mention

13    in response to Mr. Buckley's last point that every one of the

14    counts of fraud in the indictment specifically incorporates all

09:49   15    the preceding paragraphs of the indictment, which include the

16    allegations regarding the purpose of the scheme and the manner

17    and means of the scheme, which include the numerous assertions

18    that the defendant perpetrated the scheme through affirmative

19    false representations that I read before.

09:50   20              With that, unless the Court has any further

21    questions for us, I will let Ms. Annis address the Court on the

22    next motion.  Thank you.

23              THE COURT:  All right.

24              MS. ANNIS:  Your Honor, with regard to Counts Nine,

09:50   25    Ten and Eleven, basically the conspiracy count is more than

09:50   1    sufficient in addressing the elements of the offense of

2    conspiracy, and it sets out in sufficient detail to apprise the

3    defendant of the objects of the conspiracy and the information

4    the United States contends that lead to the conclusion that

09:50   5    those were the two objects of the conspiracy.

6              The suggestion that the indictment is fatal

7    absent a specific allegation that the purpose at the time the

8    money was turned over to Mr. Dodd and Mr. Posey was to make a

9    conduit contribution is not an element of the offense.  It does

09:51   10   not need to be pled in the indictment, and the indictment is

11   not, therefore, fatal, and it does not have any kind of

12   derivative affect on the two 1001 counts found in Counts Ten

13   and Eleven.

14             There is certainly case law which specifically

09:51   15   addresses the kinds of complaints that the defendant has raised

16   as to each of these counts, frankly with regard to the minutia

17   that he thinks should be pled in the indictment.

18             Frankly, indictments need not exhaustively

19   recount the facts surrounding the crime's commission.  That is

09:51   20   a statement made by the Seventh Circuit in 1997 in U.S. versus

21   Agostino, and I think it really kind of highlights the kind of

22   complaints that are being made here, which go to defensive

23   theories and plans that the defendant might like to make with

24   regard to planning how things may go in the courtroom later but

09:52   25   are certainly not required or necessary to a sufficient

09:52  1   indictment which would notify him of the charges that he must

2   face and that keep him from being placed in jeopardy for being

3   tried for the same crime on more than one occasion.

4                   With regard to Counts Ten and Twelve -- excuse

09:52  5   me -- Ten and Twelve, the 1001 charge sets out exactly the

6   elements of a violation of Title 18 1001.  The requests -- or

7   requirement imposed in the defendant's objections for

8   additional information are not required, and the United States

9   has done a more than adequate job, both in the counts

09:53  10  themselves and in the preceding paragraphs of providing him

11  specific information about exactly what happened that led to

12  the 1001 violation.  Specifically, it states that the false

13  statement to the SEC regarding the attribution of the campaign

14  contributions when the defendant knew that the money had been

09:53  15  provided by him to Mr. Posey and Mr. Dodd and that he obtained

16  the money by fraud from Person B and Foundation B, the statute

17  itself makes clear that no person shall make a contribution in

18  the name of another or knowingly permit his name to be used to

19  effect such a contribution.

09:53  20                  The question becomes whether the language of the

21  statute embraces the conduct at issue.  And as the O'Donnell

22  court and the Danielczyk court have both noted when they

23  reviewed similar objections, at least to the fact that their

24  complaints of the indictment doesn't speak specifically to

09:54  25  their conduct, both courts indicated that the language Congress

09:54   1    choose was broad rather than specific.  And we think that the

        2    indictments, as alleged, are not fatally defective and the

        3    defendant's motion should be denied.

        4            THE COURT:  Response?

09:54   5            MR. BUCKLEY:  Briefly, Your Honor.  Our beef with

        6    these conduit contribution counts, Your Honor, is that while I

        7    would tend to agree with the government's position that the

        8    structure of the allegations, for example, in Count Nine, could

        9    be seen as structurally sufficient; however, when you actually

09:54   10   look at what they are saying, they are saying that Mr. Stockman

        11   committed a conduit contribution or a conspiracy to commit a

        12   conduit contribution with his own money, which is not a

        13   contribution in the name of another.

        14            So we think the substance of what is being

09:55   15   alleged is frankly so incongruous and confusing that it

        16   undermines any other proper notice that the statute -- pardon

        17   me -- that the indictment might otherwise be giving as to Count

        18   Nine and that, in essence, Ten and Eleven flow from that

        19   ambiguity and are defective, as well, for that reason.

09:55   20           THE COURT:  All right.  Anything further on that?

        21           MS. ANNIS:  Well, I guess the only response that I

        22   have, Your Honor, is that there is no question, as you read the

        23   indictment, that what is alleged in the indictment is that

        24   Mr. Stockman conspired with Mr. Posey and Mr. Dodd.  He

09:55   25   provided them cash that he got from his fraudulent activities

09:55    1    and the cash was to be used to turn around and make this

   2    conduit payment.  It was represented to the campaign to be a

   3    campaign contribution.  It was represented to be a campaign

   4    contribution in the name of someone other than Mr. Stockman and

09:56    5    initially someone other than Mr. Dodd or Mr. Posey.  The

   6    initial contribution was in the names of their parents.  We

   7    think that is not confusing.  It is pretty straightforward and

   8    laid out in the indictment in detail.

   9            THE COURT:  We have a motion to dismiss Count Twelve

09:56   10    and then Fourteen through Twenty-two.  Are you doing the rest

   11    of them?

   12            MR. ELLERSICK:  I'm doing Count Twelve, Your Honor,

   13    and then we will go back to Ms. Annis for the remainder of the

   14    counts.

09:56   15            Defense counsel indicated Count Twelve is

   16    complicated and confusing, but he actually summed it up in

   17    about two sentences.  Mr. Stockman solicited money, assisted in

   18    soliciting money for an independent expenditure and then used

   19    the money for a coordinated expenditure.  The first part of

09:57   20    that -- part of that relates to the fraud.  The coordinating

   21    expenditure is Count Twelve and it's -- originally, there was

   22    some discussion in the motion to dismiss, their first filing,

   23    that we needed to get into the various SEC regulations,

   24    advisory opinions.  It seems now that we are on the same page,

09:57   25    that we don't need to go there.  We are talking about the

statute, and the statute lays out the language for coordination in a very clear way that the Supreme Court has already rejected a vagueness challenge to, and I think the only -- the hang up that the defense has with Count Twelve is I think that you can only have a coordinated expenditure if it involves express advocacy, and that has been rejected by the Supreme Court in McConnell, by the district court in McConnell, by the DC Court of Appeals, twice by the district court in the District of Columbia.  And so the whole discussion about express advocacy really has no application in the context of a coordinated expenditure.  That's our basic point.  So there is no need to get into anything about express advocacy here.  And that has to be the case, Your Honor, because I can think of a hundred examples where a candidate needs to fund various campaign-related expenses, so a candidate could have expenses to set up their campaign headquarters.  They need to pay rent. They need to buy dozens of computers.  Maybe they need to pay legal services.  These are all campaign-related expenses.  And if the defense argument were correct, then if a coordinated expenditure only applied to express advocacy, that candidate could go to their wealthy friends and say, hey, I need you to pay for these various campaign-related expenses out of your own pocket; they don't relate to express advocacy so there is no prohibition on us coordinating this.  And that would result in a complete erosion and destruction of the campaign contribution

09:59   1   limits.  So you don't need to have express advocacy in order to

2   have a coordinated expenditure.  It is not alleged in the

3   indictment because it is not required under the law.

4   What is alleged in the indictment is that the

10:00   5   defendant engaged in this coordinated expenditure that resulted

6   in excessive campaign contributions, involving the publication

7   and distribution of this newspaper.  It is straightforward.

8   The Supreme Court has found that the language is

9   straightforward.  It is not vague.  And so we would ask that

10:00   10   the Court reject or deny the motion to dismiss on Count Twelve.

11   THE COURT:  All right.  Thank you.

12   Anything you wanted to add?

13   MR. BUCKLEY:  Thank you, Your Honor.

14   Let me immediately address what I think is a

10:00   15   misstatement from the government that the indictment does not

16   allege express advocacy.  First of all, the indictment does

17   allege express advocacy.  It alleges -- and I quote -- in the

18   form of expenditures by Center for the American Future for

19   specific advertising, advocating for Stockman's election and

10:00   20   attacking Stockman's opponent.  That is a textbook definition

21   of express advocacy.  Furthermore, the government is overly

22   dismissive of the SEC regulatory scheme in this case, which,

23   throughout the court opinions across the United States and

24   within the Fifth Circuit, is relied on to fill gaps left by the

10:01   25   statutory scheme.  In particular, the government refers to

10:01   1   McConnell versus FEC as an indication that express advocacy has

2   been abandoned in some sense as a requirement, but McConnell

3   dealt with electioneering communications and not the type of

4   expenditures are that being addressed in this case -- or

10:01   5   alleged in this case.  And the indictment did not allege that

6   this is a functional equivalent of express advocacy.  It

7   alleges express advocacy.  Furthermore, as we have cited in our

8   response or our reply to the government's response in

9   opposition, the Fifth Circuit has in two other cases, Center

10:02   10   for Individual Freedom versus Carmouche, which is '06, and then

11   before that, Chamber of Commerce of the United States versus

12   Moore in 2002, that a limiting construction of express advocacy

13   is required to prevent First Amendment infringement of the

14   types of communications that the government is alleging in this

10:02   15   case.

16              So with those clarifications, thank you.

17              THE COURT:  Anything further?

18              MR. ELLERSICK:  Your Honor, I think by using the word

19   "advocating" in the indictment doesn't mean that we are

10:02   20   alleging express advocacy.  That's not required under the law

21   for a coordinated expenditure.  McConnell resolves that.  If

22   the Court has any question about the fact that that has been

23   resolved, I would point the Court to the McConnell decision and

24   particularly the McConnell district court decision, which very

10:03   25   clearly, if I could just read the two sentences where they

10:03   1   resolve this.  At the district court level at page 249, the

2   Court says, "Plaintiffs contend that the First Amendment limits

3   the coordination concept to express advocacy."  That's the

4   defendant's argument here.  "This view has been rejected by

10:03   5   courts in this circuit."

6            Then it cites the Orloski case and the Christian

7   Coalition case, and that reasoning was essentially adopted by

8   the Supreme Court in McConnell.  So the express advocacy

9   discussion is really besides the point.  In the Fifth Circuit

10:03   10  cases that talk about express advocacy, they are talking about

11  it in the context of an independent expenditure, not the

12  coordinated expenditure that is an excessive campaign

13  contribution.  That's where we are.  Mr. Stockman has been

14  charged with making an excessive campaign contribution through

10:04   15  coordination, and so the express advocacy limitation does not

16  apply.

17            THE COURT:  Thank you.

18            Final argument, I think, is Fourteen through

19  Twenty-two, Twenty-four and Twenty-seven.

10:04   20            MS. ANNIS:  Yes, Your Honor, just briefly.  If I

21  understand -- and I'm not claiming --

22            THE COURT:  I think as applied.

23            MS. ANNIS:  I get that.  And I think the point I'm

24  trying to make is that in his -- I will call it a hypothetical,

10:04   25  because I'm not sure what else to call it, assuming the jury

10:04   1   convicts for fraud and the hypothetical being that the

2   financial transactions at issue in these counts somehow bear

3   some nexus to the intent of the donor, number one, I'm not sure

4   how to interpret that.  One of the reasons I set out a little

10:05   5   bit about what has been alleged in each of those counts is to

6   demonstrate, number one, there is no protected speech

7   associated with those -- he calls them expenditures.  I call

8   them financial transactions.

9           Secondly, a nexus that has some nexus to the

10:05   10   donor's intended charitable goals is not obvious to me either.

11   And so I submit that as applied to the actual facts in this

12   case, there is no First Amendment issue.  There is no problem

13   with the particular transactions, and there would be no

14   violation if a jury were to convict both for fraud and for

10:05   15   money laundering for each of these counts.

16           THE COURT:  Anything else?

17           MR. BUCKLEY:  Briefly, Your Honor.  I will try to make

18   it brief.

19           THE COURT:  That's fine.

10:06   20           MR. BUCKLEY:  As I did mention earlier, I'm not aware

21   there is any case law addressing this particular point, but I

22   do disagree with the government's position that this involves

23   no protected speech or no chance at protected speech.

24           If you conceptualize a charitable organization

10:06   25   that has outflows of cash that may represent First Amendment

10:06   1   protected speech or other First Amendment protected activity,

2   that is a model of what is protected by the First Amendment.

3   And you add in some taint of fraud at some point in the

4   solicitation, the government's position is that, in essence,

10:06   5   like a Medicare billing that's predicated on a fake Form 485,

6   that affects the legitimacy of the entire flow.  Our position

7   is that it cannot and it should not, if you have some

8   fraudulent taint, which I'm not conceding, but if there was, it

9   cannot negate the entire First Amendment interest that would

10:07   10   otherwise be present in this count.  Thank you.

11   THE COURT:  All right.

12   MS. ANNIS:  The only thing I would add, Your Honor, is

13   it has been our contention throughout the indictment that there

14   is no real charitable organization with charitable goals.

10:07   15   THE COURT:  And I think that both sides did a very

16   good job briefing and identifying the issues in advance, which

17   is much appreciated.  And the additional argument here today

18   has been helpful.

19   I think that in general on the motions to dismiss

10:07   20   is that many of the arguments that Mr. Stockman is making go to

21   either the veracity or the characterization of the facts, and

22   that's not what the Courts recognize as an appropriate basis

23   for dismissing an indictment pretrial.

24   The question is whether it is a

10:08   25   legally-sufficient indictment, and the issue is whether it

1    alleges the facts that, if true, state the elements of the

2    offense.  So as we go through the various arguments, I will

3    take them in the same category that the government argued them.

4              Counts One through Eight, the mail and wire

5    fraud, I don't think the First Amendment argument gets you

6    where you want to go on behalf of Mr. Stockman.  There is a

7    clear distinction that the government properly emphasized

8    between protecting the right to engage in charitable

9    solicitations and a First Amendment shield for that, on the one

10   hand, and fraud on the other.

11             This is not a case in which the allegation is

12   simply, well, money used is going to be for X purpose, but

13   there is a certain overhead amount, or they are charging a high

14   commission, something of that sort.  Absent the kind of

15   circumstances that were pointed out, if the alleged

16   misrepresentation is you are getting the money thinking it is

17   for X and, in fact, it is simply for an entirely different Y,

18   there can be actionable fraud, criminally actionable fraud.

19   And the allegations in this indictment in great detail specify

20   how, when, to whom and what misrepresentations Mr. Stockman

21   allegedly made to obtain donations from charitable foundations

22   or individuals for a specific purpose, purposes, and, in fact,

23   none of those purposes were the purpose of the -- or the use

24   made of the contributions.  Instead, they were used to pay for

25   personal expenses, for political expenses and to finance

10:10  1   contributions to campaigns that were themselves illegal.  I

2   don't think that this fails because it treads on First

3   Amendment protected grounds.

4           I also think it shows -- it alleges sufficient

10:10  5   facts to show an attempt to defraud.  Solicitations, yes, they

6   do not need to specify exactly how the donations will be spent,

7   but, again, these allegations go a lot further.  These

8   allegations are that Mr. Stockman said, you are buying a

9   promotion, an enhancement of a purchase of a building called

10:11  10  the Freedom House.  That, instead, that money didn't go to

11  anything called the Freedom House.  It went instead to personal

12  and political expenses of Mr. Stockman.  That there would be

13  funds used for the Center for the American Future.  Instead,

14  used the money for his own purposes.  Sent an email stating

10:11  15  that donor funds were used to deliver medical supplies to Third

16  World nations and support Freedom House.  Again, that didn't

17  happen.  Went to personal expenses of Mr. Stockman, went to

18  political expenditures of Mr. Stockman and for other purposes

19  that were unrelated to the charity that was described and the

10:12  20  charitable purpose described.

21          Mr. Stockman clearly disagrees with the

22  characterization given to what he said or what people working

23  on his behalf said.  That's the stuff for trial, not for a

24  motion to dismiss.

10:12  25          MR. BUCKLEY:  Pardon me, Your Honor.  Please excuse

10:12   1    the interjection.  I realized what I forgot to mention earlier.

2    I think it is important.  We had also lodged a multiplicity --

3                THE COURT:  I understand.  We will get there.

4                MR. BUCKLEY:  Thank you, Your Honor.

10:12   5                THE COURT:  There is an argument, as well, about the

6    delay in the filing of the charge.

7                     Anything more the parties want to say about that?

8                MR. BUCKLEY:  That was, Your Honor, a complaint as

9    to -- that was in connection with our motion to strike

10:13   10   surplusage.  That was my intent.

11               THE COURT:  All right.  So we can wait on that one.

12   And the multipliciriness of the charges in these counts of the

13   indictment, I don't think that the charges -- the argument is

14   that the separate charges for mail and wire fraud relate to a

10:13   15   single charitable donation in response to one solicitation.  It

16   is all one transaction.  I think that is the parties' argument.

17               MR. BUCKLEY:  If I may just add briefly to that.  In

18   the government's response in opposition, the government pointed

19   out an analysis that I frankly missed in my initial motion.  I

10:13   20   agree with it except as to Counts Three and Four.  Quickly, my

21   rationale for that is that Count Four alleges a $450,000 check

22   from Person B, which, according to the indictment, Mr. Stockman

23   caused, fraudulently caused.

24                     Then Count Three alleges a letter that is in

10:14   25   respect and before the issuance of that check.  So my position

1    is that Count Three may well be part of the cause, and there is

2    nothing that explicitly carves out and they may, in fact,

3    relate to the same -- they may be indistinguishable.  That is

4    my complaint as to Three and Four, and the other ones I have

5    withdrawn.

6              THE COURT:  All right.

7              MR. HEBERLE:  Your Honor, on Three and Four, those are

8    two different mailings.  That's why they are two different

9    counts.  The case law is extremely clear in every circuit,

10   including the Fifth Circuit, that you can have multiple

11   violations of the mail or wire fraud statutes in connection

12   with a single scheme to defraud if you have multiple mailings

13   or multiple wires.  And these are two different mailings on two

14   different dates.  They are specified in the indictment.  That

15   is on its face sufficient to proceed to trial on those counts.

16             MR. BUCKLEY:  My disagreement with that in this

17   particular case is that the mailing in Count Four is charged as

18   an offense because it is against Mr. Stockman because the

19   allegation is that he caused it, and the allegation in Count

20   Three may well be what caused it.  So my position is that I

21   don't think the fact that a third party mails something is in

22   and of itself an offense unless there is a nexus to his cause,

23   so I see them as perhaps indistinguishable.

24             MR. HEBERLE:  Your Honor, he caused two different

25   mailings.  And because he caused two different mailings, he

10:15   1   violated the mail fraud statute two times.

2        THE COURT:  I think it passes the multiplicitiness

3   test as applied.  I understand your argument.  I don't think

4   that it has traction.

10:15   5        MR. BUCKLEY:  Understood, Your Honor.

6        THE COURT:  All right.  Counts Nine through Eleven,

7   again, the arguments presented were helpful, but I think that

8   the indictment sufficiently details the object of the

9   conspiracy, the contribution, the false statement to the

10:15   10   Federal Election Commission, the details of how the $350,000

11   was obtained, how it was given to Dodd and Posey for the

12   purpose of campaign contributions, how the report was filed

13   attributing the contributions to the parents of those two

14   individuals.

10:16   15        It seems to me that there is a sufficient basis

16   at a minimum for alleging the elements required by law for a

17   conspiracy involving Stockman, Posey and Dodd to make a conduit

18   payment and make a false report to the SEC.  So I'm going to

19   overrule that motion, as well.

10:16   20        That takes us to Count Twelve, excessive

21   contributions.  I don't think it is a -- I think that there is

22   a sufficient allegation of a crime, and the complicated

23   regulatory structure that is related to the statute does not

24   put the Court in a position of inappropriately having to

10:17   25   resolve regulatory difficulties, to the extent that is your

10:17   1   argument.  It may be complicated, but the indictment quotes the

2   statute.  It doesn't quote the regulations for the elements of

3   the offense.  There isn't a notice problem to Mr. Stockman.

4   The indictment sets out the statutory framework, details how

10:17   5   the conduct allegedly violated it.  I think the express

6   advocacy argument does not warrant dismissal for the reasons

7   that the government's argument identified.  The government

8   argues that essentially this is a fact dispute as opposed to a

9   legal impediment to proceeding on the counts at all, if it is

10:18   10   even that.  So I'm going to overrule the motion as to that

11   count, as well.

12        Finally, Fourteen through Twenty-two, Twenty-four

13   and Twenty-seven are the money laundering charges.  I don't

14   think that there is an unconstitutional as applied argument

10:18   15   here that warrants dismissal at this stage.

16        The alleged facts in this quite detailed

17   indictment set out the steps that Mr. Stockman allegedly took

18   to launder the money.  Again, Mr. Stockman is fully on notice

19   of what the government's case consists of.  I don't think there

10:18   20   is an unconstitutional as applied basis for dismissal of these

21   counts.

22        So if you want to talk about the motion to

23   strike, I'm otherwise denying the motions to dismiss.

24        MR. BUCKLEY:  Yes, Your Honor.  Thank you.

10:19   25        The motion to strike surplusage relates to the

10:19   1   allegations with regard to the Ross Center, and Person A is

2   deceased, which does relate to part of the delay that I

3   complained about.  And to clarify, in the government's response

4   in opposition, there was an analysis of a pre-indictment speedy

10:19   5   trial delay.  That is not the allegation that I have made.

6   That's not the basis of the complaint that we have.

7           The basis of my complaint is that the Ross Center

8   allegations are not sufficiently connected with a common

9   element of misrepresentation to the other allegations in the

10:19   10  indictment.  They are not independently charged in the

11  indictment, and the only purpose of them in the indictment is

12  to inflame the jury into believing that there is a greater

13  fraud scheme than there actually is and to confuse the issues.

14  That's the substance of our complaint about the surplusage

10:20   15  regarding the Ross Center.  Thank you.

16          THE COURT:  Response?

17          MR. ELLERSICK:  Your Honor, it is our view that the

18  indictment alleges a single scheme, and it is a single scheme

19  with a common purpose, common manner and means, common victims,

10:20   20  common participants, common misrepresentations, that the fact

21  that the entity is the Ross Center is really beside the point

22  because the scheme relied on Mr. Stockman's use of these sham

23  charities.

24          The only thing that mattered was that they had a

10:20   25  501(c)(3) status so he could get money from these donors.  That

10:20    1    is set out in the indictment where he is using the Ross Center

         2    for a period of time to defraud Person A.   The Ross

         3    Center 501(c)(3) status elapses, and that becomes apparent so

         4    he has to switch over to now using a different one, Life Belt

10:21    5    Limits, but the names of the entities doesn't matter.   What

         6    matters is that it was this sham 501(c)(3) to get money from

         7    these victims.   And the fact that there is no wires or mails

         8    charged in connection with the 2010 conduct is not fatal

         9    because that conduct is necessary to show Mr. Stockman's intent

10:21   10    to defraud; that he has been doing this for a long time.   He

        11    did it with Person A even before the counts charged in the

        12    indictment.   And so it is not surplusage because it's necessary

        13    to prove, one, the scheme to defraud, and, two, the intent to

        14    defraud.

10:21   15             We will just say with respect to the delay --

        16             THE COURT:   Clearly he filed within the statute of

        17    limitations.   That's not the issue.   The only question is

        18    whether there was some sort of nefariousness about knowing that

        19    the 80-year-old man was going to not reach his 81st birthday

10:22   20    and that he sadly died during the interim.   Both sides are

        21    deprived of his testimony.   The government argues that they

        22    would have been helped far more than the defendant would have

        23    been helped had the gentleman been with us long enough to have

        24    at least been deposed.

10:22   25             MR. BUCKLEY:   Our position is, of course, that the

10:22   1   opposite would be true.

2         THE COURT:  Well, I understand that's your position.

3         MR. ELLERSICK:  I will just say, Your Honor, that

4   there is total speculation that the government sat on this, and

10:22   5   the Court knows that the government was not sitting on this

6   because we were in front of the Court on multiple occasions,

7   working diligently to put this case together.

8         THE COURT:  The Court knows that because when you are

9   working, I ended up doing some work, as well, so I certainly am

10:22   10  aware and the record does reflect diligent pursuit of the claim

11  of the indictment.  And I cannot punish the government by

12  striking in a way that would suggest that they were dilatory

13  for any nefarious purpose.  They were not.  Nor do I believe

14  that there is a sufficient basis to conclude unfair prejudice

10:23   15  or delay on the motions to -- so I'm denying the motion to

16  dismiss on the basis of delay with respect to the motion to

17  strike.  And to the extent delay is part of that, it is also

18  denied on that basis.  To the extent it goes to the other

19  points you have raised, I don't think there is a sufficient

10:23   20  basis on this record, given the indictment, to strike.  I'm

21  going to deny that motion.

22         I have given you the questionnaire, and I

23  basically adopted what the parties suggested.  I made some

24  revisions to try to make it a little easier to read.  I would

10:24   25  urge that you guys go through this again and see if you can

10:24   1   shorten it in any way.  I ask that because it is simply

2   burdensome for civilians, the good men and women of the 13

3   counties from whom we draw our panels, to require them to fill

4   out this as an introduction to the multi-week trial that they

10:24   5   will then have to be involved in.  I'm afraid you are going to

6   scare people away, among other things.  So what I would like

7   you to do -- I'm going to grant your request to do this

8   questionnaire or an expanded questionnaire in lieu of the

9   standard court questionnaire.  I will honor both parties' need

10:25   10   to get the answers to the completed questionnaires in advance.

11   We haven't talked about how large the panel might be, but I

12   assume you will want at least 50 people and maybe 75.  And if

13   that is true, you will need even more time to go through the

14   materials.  So we will have to think through and talk to the

10:25   15   jury people about what the best way to get this done is.  And

16   so at our next hearing, we will address those logistics.  In

17   the meantime, review, confer and report on whether it can be

18   shortened and get me a preferably joint revised questionnaire

19   that might be somewhat crisper.

10:25   20              What else do we need to take up today?

21         MR. HEBERLE:  I think that's it from the government,

22   Your Honor.  Just briefly, on the matter of the questionnaire,

23   there are a couple questions that the defendant proposed I

24   think we would object to, but we can raise that later.  It's

10:26   25   "list your favorite U.S. president" and that kind of thing.

1       THE COURT:  I think I probably took those out.  I may

2   have.  I just don't remember.  I generally don't like those

3   either.  Some of them though -- this is an unusual case.

4   Questions that might be inappropriate in other cases may be

5   more appropriate here simply because of the inevitably -- just

6   the nature of the case.

7       MR. BUCKLEY:  My rationale for that question, Your

8   Honor, understanding that it was odd, was that it was a

9   seemingly less intrusive way of getting to the meat of

10   something than something perhaps more pointed.

11       THE COURT:  But I'm not sure what you are going to do

12   with the answer.  What are you going to do with an answer that

13   says Abraham Lincoln?  What are you going to do with an answer

14   that says Donald Trump?  What are you going to do with an

15   answer that says Bill Clinton?  That's my biggest concern with

16   something like that.

17       MR. BUCKLEY:  Understood.

18       THE COURT:  All right.

19       MR. HEBERLE:  I think that our philosophy in preparing

20   our questionnaire, at least, Your Honor, was that it is fair

21   game to ask:  Have you been a member of a nonprofit

22   organization or have you served in a position on a campaign?

23   But what we don't want to do is to try to get into people's

24   political philosophies.

25       THE COURT:  I agree, because we are going to be

10:27   1   emphasizing over and over that this case does not turn on

2   whether you agree or disagree with anything Mr. Stockman said

3   that was political.  I think that is going to be -- on the one

4   hand, we want to identify people who are so political

10:27   5   themselves that they couldn't be fair to Mr. Stockman or the

6   government.  On the other hand, we want to emphasize that this

7   is not a case about the jurors' or Mr. Stockman's political

8   views.  So we are kind of walking that line, as I see it.

9                MR. HEBERLE:  Yes, Your Honor.  And we will confer

10:28   10   with the defense in an attempt to come up --

11                THE COURT:  When is our next interim status

12   conference, Lisa?

13                THE CASE MANAGER:  January 12th.

14                THE COURT:  That's a good time, January 12.  At that

10:28   15   conference, we will work through as many of these logistics as

16   possible.  Okay?

17                MR. HEBERLE:  Thank you.

18                THE COURT:  I take it discovery is proceeding without

19   any problem?

10:28   20                MR. HEBERLE:  Yes, Your Honor.  The vast majority of

21   it has already been provided, but we are also producing

22   additional materials on a rolling basis as they come in.

23                THE COURT:  Okay.  Very good.  Thank you very much.

24                MR. HEBERLE:  Thank you.

10:28   25        *(Court adjourned at 10:28 a.m.)*

1                              * * * *

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled cause.

4

5     Date: December 22, 2017

6
                           /s/ Mayra Malone
7                           ----------------------------------------
                           Mayra Malone, CSR, RMR, CRR
8                           Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25