IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

Houston Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 4:17-cr-116-2 |
| | ) | |
| STEPHEN E. STOCKMAN, | ) | The Honorable Lee H. Rosenthal |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' TRIAL BRIEF

To head off an impending media story about questionable donations to his campaign, the defendant's congressional office issued a press release on November 1, 2013.  The press release, which the defendant personally approved, claimed the defendant had just recently learned that "two staffers in [his] congressional office made contributions not allowed under FEC rules," and that he had taken corrective action "[a]s soon as [he] found out."  The statement was a lie—a deliberate falsehood designed to cover up a conspiracy orchestrated by the defendant months earlier to funnel fraud proceeds into his campaign through straw donors.

When investigators began asking questions about the suspicious donations, the false narrative quickly unraveled.  Investigators learned that the source of the donated funds was not the staffers at all, nor was it the staffers' parents, as originally reported on the defendant's campaign disclosure forms filed with the Federal Election Commission.  Instead, the source of the donations funneled into the defendant's campaign was a bank account controlled by the defendant himself under the name, "Stephen E. Stockman DBA Life Without Limits."  That bank account was funded, in turn, with a $350,000 charitable donation secured by the defendant

1

through fraudulent means in the weeks leading up to the straw donations.

The discovery that the defendant had funneled fraudulently obtained charitable donations into his campaign was the proverbial tip of the iceberg. As described below, the evidence at trial will show that over a four-year period the defendant used a series of sham nonprofit entities to raise over $1 million in fraudulent donations. The defendant then funneled the fraud proceeds through a web of shell bank accounts before ultimately using the funds to pay for personal expenses and to illegally finance his campaigns for federal office. When all was said and done, the defendant's scheme left a lengthy and complex trail of fraud, false statements, campaign-finance crimes, money laundering, and tax violations.

In an effort to save time at trial and promote an efficient presentation of the evidence, this memorandum is intended to provide a guide for the Court regarding the evidence the United States will offer at trial and to preview several legal issues that may arise.

I.   **The United States' Proof of the Defendant's Scheme to Defraud and Related Crimes**

The United States' evidence of the defendant's fraud scheme and related crimes will focus on four primary time periods between 2010 and 2014 coinciding with the defendant's fraudulent solicitations and receipt of donations through several sham nonprofit entities.

A.   The Defendant Fraudulently Obtained $285,000 in Charitable Donations Using the Ross Center in 2010

The evidence at trial will show that the defendant's fraud scheme dates back to 2010, when he secured several fraudulent donations using the name of a shell nonprofit called the Ross Center. On June 1, 2010, the defendant opened a bank account under the name, "Stephen E. Stockman DBA Ross Center," and he deposited his first charitable donation of $25,000 from Foundation A, a Maryland-based charitable foundation run by Person A. Over the next several

months, the defendant and his co-defendant, Thomas Dodd, secured three additional donations from Person A's foundation, for a total of $285,000 in charitable donations in 2010.

Through witness testimony, emails, and other correspondence, the evidence at trial will establish that the purpose of Person A's donations to the Ross Center was to fund legitimate voter education projects in jurisdictions across the country in the run-up to the November 2010 elections. The defendant, Dodd, and Person A's office exchanged multiple emails and other correspondence outlining the list of target races where Person A wanted his donations designated. And following the elections, Dodd and the defendant prepared an after-action report for Person A listing the results of the elections in the various jurisdictions purportedly targeted by the Ross Center using the charitable donations.

Financial records at trial will show that, contrary to the representations made to Person A, the Ross Center was merely a prop to secure donations, and that the Ross Center bank account was nothing more than a shell—a brief repository for Person A's donations before the defendant moved the funds through a series of other shell bank accounts from which he ultimately spent the proceeds on personal and living expenses.[1]

Financial records will show, for example, that the $285,000 in donations represented more than 90 percent of the defendant's total income from May 2010 through the end of the year. Of the $285,000, the defendant paid Dodd $98,000 in commissions and bogus "expense reimbursements" to wipe out Dodd's massive credit card debts for expenses totally unrelated to Person A or any voter education projects. Of the remaining $187,000 in charitable funds, the

---

[1] Other than the donations from Person A's foundation, the Ross Center had no other deposits in 2010. In fact, one of Person A's $100,000 donations to the Ross Center was not even deposited into the Ross Center account, but was instead deposited directly into one of the defendant's nine other personal bank accounts.

defendant spent only approximately $80,000 in the run-up to the November elections, with virtually all of the money going toward the defendant's personal living expenses. Approximately $107,000 of the Person A donations remained spread among the defendant's various bank accounts following the November elections, and the defendant continued to live off of the money through the end of the year.  The defendant's use of the Person A charitable donations took an unusual turn in January 2011, when the defendant spent approximately $13,000 in charitable funds to travel with Dodd to South Sudan in an effort to secure a multi-million dollar foreign lobbying contract with the region's newly formed government.

Additional email evidence will show that in early 2011 the defendant and Dodd continued to come up with new ways to solicit donations from Person A, at one point exchanging a draft proposal seeking $1 million for the Ross Center.  These efforts all fell flat, and the defendant eventually spent down what remained from the Person A charitable donations by the end of November 2011.  Despite having enjoyed the fruits of living off Person A's charitable donations for most of 2010 (and well into 2011), the defendant never filed a tax return or paid taxes on any of his 2010 income.

B. The Defendant Fraudulently Obtained $165,000 in Charitable Donations Using the Ross Center and Life Without Limits in 2012

In August 2011, the defendant opened a bank account under the name, "Stephen E. Stockman DBA Friends of Steve Stockman" in anticipation of a run for Congress in early 2012. Over the next several months, the defendant's campaign fundraising efforts yielded little to no results.  Unable to rally sufficient donations from his prospective constituents, the defendant and Dodd approached Person A in December 2011 to seek financial assistance for Stockman's campaign.  The defendant proposed that Person A provide a personal loan that the defendant

4

could turn around and use to finance the campaign.  Person A rejected the proposal, and said that his family's charitable foundations would donate only to other qualifying 501(c)(3) charities, not directly to political campaigns.  Undeterred, the defendant and Dodd requested that Person A send a donation to the Ross Center to be used for legitimate charitable or educational purposes.

Between January 2012 and July 2012, the defendant received four donations totaling $165,000 from Person A's foundations in the names of the Ross Center and another sham nonprofit co-opted by the defendant, Life Without Limits.  Over that same period of time, the defendant opened a series of shell bank accounts in the names of the purported nonprofits, where he deposited the donations before quickly moving the funds to his other personal accounts.  The United States will present emails, financial records, and other business records demonstrating that the defendant used a substantial portion of the Person A charitable donations in 2012 to secretly finance his congressional campaign and make up for what he could not achieve through lawful campaign fundraising from constituents.  To cover up the scheme, the defendant brazenly reported on his campaign finance reports that the charity funds flowing into the campaign were personal "loans" from himself.

Despite reaping the personal rewards of Person A's charitable donations to the Ross Center and Life Without Limits, the defendant did not file a tax return for tax year 2012 until March 2017, and even then he reported no personal income and only $29,800 in gross business income—a fraction of the $165,000 in charitable donations the defendant diverted to pay for campaign and other personal expenses during that calendar year.

C.  The Defendant Fraudulently Obtained $350,000 in Charitable Donations Using Life Without Limits in 2013

Within weeks of being sworn into office as a Member of the United States House of

Representatives for Texas's 36th Congressional District, the defendant and Dodd travelled to the Chicago area to solicit a donation from Person B, a wealthy philanthropist who ran his family's charitable foundation, Foundation B, which donated millions of dollars per year to other qualifying 501(c)(3) charities.

The defendant's pitch to Person B was straightforward: he wanted to renovate a house in Washington, D.C. to serve as a combination living facility and training center for congressional interns. The project, according to a pamphlet the defendant and Dodd presented to Person B, was called the Freedom House. Person B liked the idea, and he trusted that the new congressman would be a good steward of his funds, so he agreed to make a $350,000 donation from his family's charitable foundation to the project. The memo line on the check read, "2013 Charitable Contribution."

The defendant deposited the $350,000 check into his Life Without Limits account on January 30, 2013, which had a balance of only $33.48 at the time. Within 24 hours of the charitable donation posting to the Life Without Limits account, the defendant wrote two checks for $13,000 each to pay off campaign debts owed to two individuals. Days later, the defendant issued a check to Citicards for $31,713.82, the exact amount to the penny to pay off Dodd's credit card debt, which he had been carrying for more than a year. Two days later, checks were issued to Dodd and Posey for $12,000 and $12,500, respectively, which, at the defendant's direction, they used to each write $7,500 in checks to the defendant's congressional campaign. By February 12, 2013—less than two weeks after receiving the $350,000 donation for the Freedom House—the defendant had spent the donation down to $267,000. Eight months later, the donation was down to approximately $115,000, and none of the money had gone to the

6

Freedom House.   As more fully described below, the defendant subsequently caused the remainder of the $350,000 donation to be spent on personal expenses and on financing his campaigns for elected office.

Despite having spent almost all of the Freedom House donation for his own personal use and benefit, the defendant's 2013 tax return failed to report any of the $350,000.

D.  <u>The Defendant Fraudulently Obtained $450,571.65 in Donations Using Center for the American Future in 2014</u>

As 2014 approached, the defendant set his sights on the United States Senate.  But with his fundraising prospects flat lining and the Senate primary scheduled for March 2014, the defendant needed another way to finance his campaign.  The evidence at trial will show that the defendant's campaign strategy revolved around the printing and mass-mailing of campaign publications designed to look like genuine newspapers.  The newspapers bore generic titles like, "The Southeast Texas Times," and "Texas Republican News," while the content—written by the defendant's campaign workers—focused on extolling the defendant's virtues and attacking his opponents.  In the run-up to the 2014 Senate election, the defendant commissioned the creation of another version of the "Texas Republican News," that focused on attacking the defendant's opponent in the senate primary race, incumbent Texas Senator John Cornyn.

Because the defendant's campaign lacked the funds to print and mail the fake newspaper, the defendant set out to secure a massive donation for an "independent" expenditure.  Under the law, individuals and organizations can spend unlimited amounts of money to influence federal elections, so long as the spending is done independently of the federal candidate or the candidate's campaign—a practice commonly referred to as an independent expenditure.  But to the extent the spending is done in cooperation, consultation, or concert with the candidate, or at

the request or suggestion of the candidate, the spending is considered a campaign contribution subject to contribution limits, which was $2,600 in 2014.

To get around these limits, the defendant and Posey came up with the idea of doing an independent expenditure through a 501(c)(4) social welfare organization Posey had created called Center for the American Future. Like Life Without Limits and the Ross Center before it, Center for the American Future existed only on paper and served no other purpose but to secure donations for the defendant. In addition, witness testimony and emails at trial will prove that, rather than operating independently, Posey and Center for the American Future were nothing more than an arm of the defendant and his Senate campaign.

To finance the printing of the fake newspaper, the defendant and Posey began by secretly diverting what was left of the Person B $350,000 Freedom House donation. They then deceived Person B into making a $450,571.65 donation on behalf of Center from the American Future to fund what Person B believed was an independent expenditure—unconnected to the defendant or the defendant's campaign—to fund the mailing of the newspaper. Only about half of the $450,571.65 went toward the mailing, and the remaining funds were spent down following the defendant's defeat in the March 4, 2014, primary election.

A few months later, in May 2014, Person B's accountant emailed the defendant's congressional office requesting documentation for Foundation B's tax records concerning the 2013 donation of $350,000 to Life Without Limits. The email was immediately forwarded to the defendant and Posey. Several days later, at the defendant's direction, Posey sent a letter to Person B's accountant on Life Without Limits letterhead along with the 501(c)(3) verification letter for Life Without Limits. The letter thanked Person B for his $350,000 gift, and reported,

"[w]ith your financial assistance of $350,000 in February 2013, allowed [sic] Life Without Limits, to deliver medical supplies to third world nations and support Freedom House."  The letter concluded, "Your continued support is crucial to our mission."

 E. <u>The FBI's Investigation and Posey's Flight to Egypt</u>

  By the summer of 2014, the FBI's investigation of the initial allegations involving the straw donations to the defendant's campaign was underway.  The defendant was still in Congress, while Posey was in Alaska researching the prospect of the defendant running for a Senate seat there.  Around that time, the defendant summoned Posey back to Texas.  At the defendant's direction, Posey used a portion of the remaining Person B independent expenditure funds to purchase computers, make two large cash withdrawals totaling $9,000, and buy a one-way plane ticket to Egypt.  Posey complied and fled the country in early September 2014, narrowly dodging an interview by the FBI.

  With Posey safely stashed away overseas with what remained of the Person B independent expenditure funds, the defendant served out the rest of his term and eventually left Congress in January 2015.  Financial records will show that over approximately the next two years, the defendant provided regular financial support to Posey in Egypt, including by sending Posey money through bitcoin transactions.

  The defendant's white-collar crime spree came to an end when the defendant and his two co-conspirators, Dodd and Posey, were indicted by a Houston grand jury in March 2017.

**II.** **<u>Anticipated Evidentiary and Legal Issues at Trial</u>**

  The United States anticipates based on the Court's current schedule that the presentation of the evidence for the government's case-in-chief will take approximately four weeks.  In order

to appropriately expedite the presentation of the evidence, and also to assist the Court in addressing potential legal or evidentiary issues, the United States highlights the following issues that may arise during the course of trial.

A. Recalling Law Enforcement Witnesses

In order to promote an efficient presentation of the evidence and assist the jury in understanding the general chronology of the facts, the United States intends to adopt the common method of recalling law enforcement witnesses to testify to records and evidence that generally align with the chronology of other witness testimony. The practice of recalling law enforcement agents to introduce evidence in chronological order is well-established. *See, e.g., United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982) (affirming district court's discretion under Federal Rule of Evidence 611(a) to permit case agent to take the stand on four separate occasions to describe events in chronological order); *United States v. Edelin*, 128 F. Supp. 2d 23, 47 (D.D.C. 2001) (collecting cases and allowing recall of witnesses throughout the government's case-in-chief as "the best way of providing a clear and orderly trial"); *United States v. Dimora*, 843 F. Supp. 2d 799, 823 (N.D. Ohio 2012) (collecting cases and permitting the government agent to "testify in segments related to specific schemes during [the government's] case-in-chief"); *United States v. Rodgers*, 2014 WL 3735585, at *2 (W.D. Pa. July 28, 2014) (permitting recall of law enforcement officers pursuant to the court's authority under Rule 611(a) to allow the government to present its evidence chronologically); *United States v. Bacon*, 2012 WL 5381415, at *1 (W.D. Pa. Oct. 31, 2012) (same); *cf. United States v. Coleman*, 805 F.2d 474, 482 (3d Cir. 1986) ("The district court has discretion to allow the recall of a witness, even if the witness has consulted with the prosecutor in the interim.").

The ability to present the evidence in chronological order is particularly important in this case, given the long period of time covered by the defendant's scheme and the numerous financial transactions involving the movement of fraud proceeds among various bank accounts and individuals.  The law enforcement agents will not offer testimony that is cumulative of other witnesses, nor does the United States intend to have the law enforcement witnesses provide a general summary of the facts of the entire case.  *Cf. United States v. Fullwood*, 342 F.3d 409, 413 (5th Cir. 2003) (expressing disapproval of the practice of "allow[ing] the Government to repeat its entire case-in-chief shortly before jury deliberations" through an agent's summary testimony).  Instead, the agents will testify to discrete transactions or events that fit within the general chronology of the lay witness testimony.  And because the agents will be subject to cross examination on the topic of their direct testimony each time they take the stand, the defendant will suffer no prejudice from a chronological and orderly presentation of the evidence.

B. Use of Summary Charts as Substantive Evidence Under Rule 1006

To further promote an efficient presentation of the evidence—and to aid the jury in understanding the complex and voluminous records left in the wake of the defendant's fraud scheme—the United States intends to introduce various charts into evidence that accurately summarize financial and other records under Federal Rule of Evidence 1006.  That rule provides that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed.R.Evid. 1006.  With respect to the underlying records that support the summary exhibit, the rule states that, "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place[,] [a]nd the court may order

11

the proponent to produce them in court." *Id.* Rule 1006 is "based on the common-law rule that a party may prove the contents of voluminous writings that cannot be examined in court without causing inconvenience and waste of time by presenting evidence of their contents in abbreviated form." 6-1006 Weinstein's Federal Evidence § 1006.02 (2017).

The foundation for admitting a summary chart under Rule 1006 consists of establishing that the underlying records are sufficiently voluminous or complex so as to make their review in court "inconvenient." *United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001) ("Rule 1006 allows admission of summaries when (1) the evidence previously admitted is voluminous, and (2) review by the jury would be inconvenient."); *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000) (noting that "Rule 1006 applies to summary charts based on evidence previously admitted but which is so voluminous that in-court review by the jury would be inconvenient."); *United States v. Tannehill*, 49 F.3d 1049, 1056 (5th Cir. 1995) (observing that Rule 1006's requirements were satisfied where "[t]he documents summarized in the charts were voluminous, and in-court examination would have been more than inconvenient"); *United States v. Stephens*, 779 F.2d 232, 239 (5th Cir. 1985) (noting that "Rule 1006 requires (1) the underlying writings be voluminous and (2) in-court examination not be convenient," but adding that the rule, "does not require that it be literally impossible to examine the underlying records before a summary chart may be introduced") (internal quotation marks omitted). The district court retains broad discretion in determining whether records are sufficiently voluminous or complex to qualify for admission under Rule 1006. 2 McCormick On Evid. § 241 (7th ed.); *see also United States v. Appolon*, 695 F.3d 44, 61 (1st Cir. 2012) ("No precise test dictates when source materials are sufficiently indigestible to permit summarization under Rule 1006. Instead, district courts are

12

advised to carefully weigh the volume and complexity of the materials.  These two factors have an inversely proportionate relationship: as either the volume or complexity increases, relatively less is required of the other factor.  The ultimate question, of course, is whether summarization will remove logistic or cognitive barriers to the jury's discharge of its duties.") (internal citation omitted).

In addition to showing that the records are sufficiently voluminous or complex, the proponent must demonstrate that the underlying records themselves are otherwise admissible under the rules of evidence.  2 McCormick On Evid. § 241.  In other words, a summary chart under Rule 1006 cannot be used as backdoor to introduce otherwise inadmissible evidence. *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004).  So long as the underlying records are admissible, however, the proponent has the discretion to move the records into evidence or to simply rely on the summary exhibit.  *Compare Stephens*, 799 F.2d at 239 (observing that "one proper method of laying a foundation for admission of summary charts" is "admitting the documentation on which the summary is based"), *with United States v. Valencia*, 600 F.3d 389, 417-18 (5th Cir. 2010) (holding that requiring the admission of underlying records would "contravene the plain language and purposes of Rule 1006").

Finally, the proponent of a summary chart under Rule 1006 must establish that the exhibit accurately summarizes the underlying records.  While a summary may reflect factual assumptions by the proponent, the summary must ultimately provide an accurate reflection of the underlying records.  *Taylor*, 210 F.3d at 315-16 ("A necessary precondition to the admission of summary charts is that they accurately reflect the underlying records or testimony, particularly when they are based, in part, on the government's factual assumptions."); *United States v.*

*Armstrong*, 619 F.3d 380, 384 (5th Cir. 2010) ("The presence of an inference itself is not prejudicial, for under rule 1006, the essential requirement is not that the charts be free from reliance on any assumptions, but rather that these assumptions be supported by evidence in the record.") (internal quotation marks omitted).

Once the requisite foundation is provided, a Rule 1006 summary may be admitted into evidence and go to the jury just like any other admitted exhibit.  2 McCormick On Evid. § 241. Because a Rule 1006 summary is itself evidence, no limiting or cautionary instruction is generally required.  *United States v. Williams*, 264 F.3d 561, 575 (5th Cir. 2001) ("A summary chart that meets the requirements of Rule 1006 is itself evidence and no instruction is needed."); *United States v. Smith*, 822 F.3d 755, 759 (5th Cir. 2016) (same); *see also* 5th Cir. Crim. Pattern Jury Instr. § 1.44, explanatory note (2015 Ed.) ("The Committee advises the judge to determine whether the proponent of the summary evidence is seeking its admission as evidence itself.  If so, and if Rule 1006 conditions are met, [a cautionary] instruction may not be necessary.").

In contrast to summaries under Rule 1006, a summary or chart that serves simply as a demonstrative aid or pedagogical device is not admitted into evidence and does not go to the jury.  Indeed, Rule 1006 does not apply to such demonstrative aids, which are instead governed by Rules 611 and 403, and which require a cautionary instruction.  *See, e.g.*, *United States v. Posada-Rios*, 158 F.3d 832, 869 (5th Cir. 1998) (discussing the use of demonstrative aids under Rule 611).

As outlined above, the defendant's fraud scheme spanned four years from 2010 to 2014 and involved raising over $1 million in fraudulent donations.  To prove that the defendant committed fraud and misspent the donations, a large portion of the evidence will focus on tracing

14

the donations through a web of bank accounts to the point where the funds were actually spent. Presenting that evidence through each individual bank statement, check, wire transfer, deposit slip, withdrawal slip, or other bank record, would be unreasonably time consuming for the Court and the jury.  Further, given the complexity with which the funds were routinely moved from account to account, even some transactions involving less than 5 or 10 bank records require a summary to fully understand their significance.  Similarly, voluminous phone records showing thousands of calls to unidentified phone numbers are of no value to the jury in their raw form, and only become probative when accurately summarized in a Rule 1006 exhibit.

All of the government's charts will be authenticated by witnesses at trial who will testify that the exhibits are fair and accurate summaries of the underlying records.  Further, to avoid any question with respect to the accuracy of the summaries, the United States intends to admit into evidence the underlying financial and phone records,[2] all of which are otherwise admissible as certified business records under Rules 803(6) and 902(11).

Finally, the United States may use a limited number of demonstrative aids, such as timelines or other graphics, that do not necessarily summarize voluminous records, but that may assist the jury in understanding the evidence presented through witness testimony and other records.  Unlike the Rule 1006 summaries, those demonstrative aids will not be offered into evidence.

---

[2] The United States intends to offer the underlying bank records into evidence by bank account name and account number.  Thus, Government Exhibits 1 through 46 each contain the relevant bank records for 46 different accounts.  While the government will offer all of the records into evidence, the United States does not as a general matter intend to publish Exhibits 1 through 46 to the jury.  Only when a specific bank record in Exhibits 1 through 46, such as a check, is needed to highlight a particular transaction or otherwise support the witness's testimony will the specific underlying record be marked as a separate exhibit, shown to the witness, and offered for admission and publication.

C.  <u>Statements Offered as Non-Hearsay or Under Various Exceptions to the Hearsay Rule</u>

During the trial, the United States will offer relevant statements of the defendant and other parties through emails, correspondence, business records, and witness testimony.  Many of the out-of-court statements will not implicate the hearsay rule because they will not be offered for their truth.  On occasion, for example, the fact that a statement was made will itself be relevant.  *Dutton v. Evans*, 400 U.S. 74, 88 (1970) ("Neither a hearsay nor a confrontation question would arise had [witness's] testimony been used to prove merely that the statement had been made."); *see also Kepner–Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 540 (5th Cir. 1994) ("Signed instruments such as wills, contracts, and promissory notes are writings that have independent legal significance and are not hearsay.").  Similarly, statements in the form of questions or commands do not implicate the hearsay rule because they do not constitute assertions.  *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990) (noting that "most questions and inquiries, are not hearsay because they do not, and were not intended to, assert anything"); *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314-15 (6th Cir. 2009) (collecting cases and observing that "if the statements were questions or commands, they could not . . . be offered for their truth because they would not be assertive speech at all.  They would not assert a proposition that could be true or false.").

By way of example, the United States intends to offer the statement of Person A to the defendant and Dodd during the late December 2011 meeting, described above, at which Person A declined to provide a personal loan to the defendant and said he would only donate to a qualified 501(c)(3) organization.  Person A's bare refusal of the defendant's solicitation for a personal loan is tantamount to a non-assertive command that falls outside the hearsay rule.

16

Simply saying, "no," does not communicate a "proposition that could be true or false." *Rodriguez-Lopez*, 565 F.3d at 315.[3]

Other statements offered at trial will be offered for their truth, but will fall within an exemption or one of several exceptions to the hearsay rule. Statements of the defendant that are offered against him, for example, do not constitute hearsay. Fed.R.Evid. 801(d)(2).[4] This would include statements submitted by the defendant's campaign, which, when offered for their truth, would qualify as statements of an authorized speaker or the defendant's agent. Fed.R.Evid. 801(d)(2)(C)-(D). It would also include statements made by the defendant's co-conspirators during and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). On this point, it is not necessary that a conspiracy be charged for the statement to be admitted, *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993), nor is it necessary that the statement be made in furtherance of a *criminal* conspiracy, *United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013) ("A conspiracy for the purpose of the hearsay exclusion need not be unlawful; the statement may be made in furtherance of a lawful joint undertaking.") (internal quotation marks omitted).

Finally, the United States intends to offer numerous business records accompanied by certificates of authenticity under Rule 902(11). As certified business records, those exhibits would be admissible under Rule 803(6) as records of a regularly conducted activity.

---

[3] The remaining portion of Person A's statement—that he would donate only to qualifying 501(c)(3) organizations—is admissible under Rule 803(3) as a statement of the declarant's then-existing state of mind, for the same reasons outlined in the United States' Motion to Admit Written Statement, (R. Doc. 143).

[4] Statements by others offered to provide context for the defendant's statements would likewise be admissible as non-hearsay. *United States v. Cheramie*, 51 F.3d 538, 540-41 (5th Cir. 1995).

D. <u>Hostile witnesses</u>

The United States anticipates that one or more of the witnesses it calls to testify may exhibit hostile behavior based on their longtime association and close relationship with the defendant.  In such an event, the United States will seek the Court's permission to ask the witness leading questions.  Federal Rule of Evidence 611 specifically allows for a party to ask leading questions of its own witness if the witness exhibits hostility:  "Ordinarily, the court should allow leading questions . . . when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."  Fed. R. Evid. 611(c).  The Court has broad discretion to allow a questioning party to use leading questions on direct examination.  *See* Fed.R.Evid. 611, advisory committee's note (noting that this determination "clearly falls within the area of control by the judge over the mode and order of interrogation and presentation"); *United States v. Tunnell*, 667 F.2d 1182, 1188 (5th Cir. 1982) (deeming a trial court's determination that a witness was hostile "a judgment call" that should not be disturbed "absent a demonstration of abuse of discretion.").  Trial courts have this discretion because a witness's "hostility" or adversity can manifest itself in ways that only the trial court can perceive through observing the witness.  In *Tunnell*, for instance, "[t]he trial judge was able to note [the witness's] attitude reflected by his motions, facial expressions, demeanor, and voice inflections.  As a result, the trial judge concluded that [the witness] evinced a hostility to the prosecution, which made leading questions appropriate."  667 F.2d at 1188.

The Fifth Circuit has upheld allowing parties to use leading questions of their own witnesses based on a range of witness behavior, from mere reluctance or evasiveness, to dubious memory problems, to explicit hostility.  *See Gill v. United States*, 285 F.2d 711, 712-713 (5th

Cir. 1961) ("[T]he witness was clearly evasive in his answers.  Some reasonable latitude must be allowed the prosecuting attorney in refreshing a witness' recollection, particularly in dealing with a reluctant, if not necessarily hostile, witness."); *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 761-62 (5th Cir. 2008) (observing that the trial court was justified in allowing leading questions of witness "given the extent of [witness's] memory problems, which reasonably appears to have been feigned, and [witness's] hostility"); *United States v. Sutherland*, 463 F.2d 641, 650 (5th Cir. 1972) ("The witness was avowedly hostile and some leading was permissible."); *United States v. Alfonso*, 552 F.2d 605, 617 (5th Cir. 1977) (leading permissible based on witness's "reluctance to testify and evasiveness in his testimony").  Should any of the government's witnesses evince reluctance, evasiveness, feigned forgetfulness, or clear hostility—demonstrated through demeanor, tone, or body language—the government may request permission from the Court to lead the witnesses consistent with Federal Rule of Evidence 611.

E.   <u>Specific Instances of Good Acts Evidence Offered by the Defendant</u>

In the event the defendant seeks to present evidence of specific instances of purported good acts as circumstantial proof that he did not commit the charged offenses, the Court should exclude such evidence.  Evidence of a person's character is generally not admissible to prove that on a particular occasion the person acted in accordance with that character.  Fed. R. Evid. 404(a).  Federal Rule of Evidence 404(a)(2) establishes an exception to this rule, permitting a criminal defendant to introduce evidence of good character (which the prosecution may rebut) in order to support an inference that the defendant would not have committed the charged crimes.

Yet in recognition of the confusion, unfair prejudice, and substantial delay that would

result if defendants were permitted to introduce evidence of each of their purported good acts, the rules of evidence also place important constraints on a defendant's introduction of character evidence. Federal Rule of Evidence 405 requires that a criminal defendant attempt to prove good character only through "testimony about the [defendant's] reputation" or by "testimony in the form of an opinion" — not evidence of the defendant's specific purported good acts. See Fed. R. Evid. 405(a). Indeed, the single, narrow exception to this prohibition on the introduction of specific purported good acts is when a defendant's "character or character trait is an essential element of a charge, claim, or defense." Fed. R. Evid. 405(b). This is because, as the advisory committee notes to Rule 405 observe, "evidence of specific instances of conduct . . . possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time" and should only be introduced when "character is, in the strict sense, in issue."

The category of cases for which the defendant's "character or character trait is an essential element of a charge, claim, or defense," is narrow. *See* 1 McCormick On Evid. § 187 (7th ed.) (collecting cases and noting that specific instances of conduct are only admissible in the "unusual situation in which an offense, claim, or defense for which character is an essential element is pled," such as an action for defamation or negligence). Thus, for example, character is not an essential element of a charge or defense in a criminal case where the defendant is simply arguing a "lack of motive or intent." *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990). In *Marrero*, a case arising from a prosecution of false insurance claims, the defendant "sought to prove that her good character was inconsistent with criminal intent by introducing evidence of specific acts of good character." 904 F.2d at 259. The Fifth Circuit affirmed the exclusion of the good-acts evidence, observing that the defendant's "character in

[the] case was simply not an essential element of the charges against her," and that the defendant's tactic of trying to "use specific acts circumstantially to prove lack of intent" was "not only disfavored, [but was] not permitted under Rule 405(b)."  *Id.* at 260; *see also United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978) ("Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (observing that "evidence of good conduct is not admissible to negate criminal intent") (internal quotation marks omitted).[5]

Because this is not a case in which the defendant's "character or character trait is an essential element of a charge, claim, or defense," Fed. R. Evid. 405(b), the only proper method for the defendant to establish his good character is through opinion or reputation testimony of character witnesses.  Allowing the defendant to present evidence of other good acts would confuse the jury and waste time, while not offering anything probative of the actual facts of consequence in the case.  Accordingly, like in *Marrero*, the defendant should not be permitted to present evidence of specific purported good acts as circumstantial proof of his lack of intent to commit the charged offenses.

   F.   <u>Opening the Door to Evidence Arguably Protected by the Speech or Debate Clause</u>

In the wake of the media reports about straw donations to the defendant's campaign in November 2013, the Office of Congressional Ethics (OCE) conducted an investigation and

---

[5] Evidence of other good acts is likewise inadmissible under Rule 404(b), even if offered to prove the defendant's intent, because a defendant's good acts in situations unconnected to the charged offenses are simply not probative of the defendant's intent.  *See Marrero*, 904 F.2d at 260 ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment."); *see also United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) ("For the same reason that prior 'bad acts' may not be used to show a predisposition to commit crimes, prior 'good acts' generally may not be used to show a predisposition not to commit crimes.").

ultimately referred the matter to the House Ethics Committee.  In connection with those proceedings, the defendant submitted two formal statements, and Dodd and Posey also submitted written statements, all of which were false.  Notwithstanding the falsity of the defendant's statements, out of an abundance of caution the United States does not intend to present any evidence concerning the OCE or House Ethics Committee investigations in the event the statements submitted as part of those proceedings may be considered legislative acts protected by the Speech or Debate Clause, U.S. CONST., Art. I, § 6, cl. 1.  *Compare FEC v. Wright*, 777 F. Supp. 525, 530 (N.D. Tex. 1991) (concluding that a Member's statements to the House Committee on Standards of Official Conduct concerning a private publication did not constitute "legislative acts" protected by the Speech or Debate Clause), *with  In re Grand Jury Subpoenas*, 571 F.3d 1200, 1204 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (opining that "[a] Member's statement to a congressional ethics committee is speech in an official congressional proceeding and thus falls within the protection of the Clause").

The defendant, however, may open the door to such evidence through his own questioning of witnesses or presentation of evidence.  When a defendant whose legislative acts would otherwise be protected by the Speech or Debate clause chooses to put those legislative acts in issue, the government is entitled to respond with evidence of legislative acts on the same point. *United States v. Renzi*, 769 F.3d 731, 747 (9th Cir. 2014) (collecting cases and holding that "if a member of Congress offers evidence of his own legislative acts at trial, the government is entitled to introduce rebuttal evidence narrowly confined to the same legislative acts, and such rebuttal evidence does not constitute questioning the member of Congress in violation of the Clause.").

22

The Court in *Renzi* applied this principle when the defendant put legislative acts in issue through the cross-examination of government witnesses.  There, the defendant, a United States Congressman, elicited evidence of legislative acts—the defendant's spearheading of a piece of legislation—through cross-examination of a government witness; two days later, the government elicited testimony from a different witness about the defendant's involvement in that same piece of legislation.  769 F.3d at 748-749.  The court rejected the defendant's challenge to the government's use of legislative acts:  "Because Renzi himself elicited this legislative act testimony through cross examination of [the first witness], we conclude that the government was permitted to provide rebuttal evidence on this narrow point."  *Id*. at 749.

The oft-cited principle from the Supreme Court that the Speech or Debate Clause does not "make Members of Congress super-citizens," *United States v. Brewster*, 408 U.S. 501, 516 (1972), has special application in this context: the defendant should not be allowed to present a one-sided, self-serving version of legislative acts evidence through either his own testimony[6] or the questioning of witnesses.    Thus, if the defendant were to cross-examine government witnesses about the ethics investigations, or if the defendant himself were to testify about the ethics investigations, it would open the door to the defendant's statements to congressional investigators.

---

[6] The *Renzi* court made clear that Members of Congress can open the door to legislative acts by either cross-examining other witnesses or testifying themselves about those acts.  *Renzi*, 769 F.3d at 747 n.3.

## CONCLUSION

The United States is prepared to present this case to the jury and prove each of the charges in the Superseding Indictment beyond a reasonable doubt.

Dated: March 13, 2018                         Respectfully submitted,

RYAN K. PATRICK                               ANNALOU TIROL
United States Attorney                        Acting Chief, Public Integrity Section

Melissa Annis                                 Ryan J. Ellersick
Assistant United States Attorney              Robert J. Heberle
                                              Trial Attorneys

                                               /s/ *Ryan J. Ellersick*
                                              Ryan J. Ellersick
                                              Trial Attorney
                                              Public Integrity Section
                                              Criminal Division
                                              United States Department of Justice
                                              1400 New York Avenue NW
                                              Washington, DC 20530
                                              Telephone: (202) 514-1412
                                              E-mail: ryan.ellersick2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 13, 2018, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause a true and accurate copy to be sent to counsel of record for defendant Stockman.

/s/ *Ryan J. Ellersick*
Ryan J. Ellersick

25