IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 4:17-cr-116-2 |
| | ) | |
| STEPHEN E. STOCKMAN, | ) | The Honorable Lee H. Rosenthal |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE PENDING SENTENCING

The United States of America, by and through undersigned counsel, respectfully requests that the Court deny the defendant's motion for release pending sentencing. (R. Doc. 255). The defendant's motion fails to address in any meaningful way the overwhelming evidence adduced at trial showing that the defendant would pose a significant flight risk if released. Among other things, this evidence proved that the defendant has extensive foreign contacts in nations where his location and extradition would be difficult (if not impossible); that the defendant may have access to financial resources unknown to the government and the Court; and that the defendant has a demonstrated history of deceiving others and obstructing the judicial process to evade responsibility for his crimes. In addition, the defendant has been convicted of numerous serious felony offenses and is facing the likelihood of a substantial prison sentence, providing him with a strong incentive to flee. His motion should be denied.

## BACKGROUND

On April 12, 2018, following a trial lasting approximately four weeks, a jury found the defendant guilty beyond a reasonable doubt of orchestrating a long-running and sophisticated

1

scheme to defraud charitable donors of more than $1.2 million, which the defendant secretly diverted to finance his political campaigns and to pay for personal expenses, convicting him of twenty-three counts of mail fraud, wire fraud, conspiracy to make conduit contributions and false statements to the Federal Election Commission ("FEC"), making false statements to the FEC, making excessive coordinated campaign contributions, money laundering, and filing a false tax return. (*See* Verdict Form, R. Doc. 211). The evidence at trial showed that the defendant furthered this scheme by repeatedly lying to the charitable donors, the authorities, and the public. The defendant also used dozens of bank accounts and several sham nonprofit entities to conceal the sources and the movement of the fraudulently obtained funds. Following the verdict, the United States moved for the detention of the defendant, and the Court ordered him detained pending sentencing, based in part on his extensive international contacts, the severity of the potential sentences that may be imposed following his conviction, and the lack of reliable information concerning the defendant's access to financial resources. The defendant has been in custody since that time.

## ARGUMENT

The release or detention of a criminal defendant pending sentencing is governed by 18 U.S.C. § 3143(a), which places squarely on the defendant the burden of showing by clear and convincing evidence that he is not a flight risk. As relevant here, § 3143(a)(1) provides that "the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released . . . ." Furthermore, "[t]he burden of

establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant." Fed. R. Crim. P. 46(c).

"A convicted defendant has no constitutional right to bail," and thus "any putative right to bail derives from 18 U.S.C. § 3143, which establishes a presumption against its being granted." *United States v. Olis*, 450 F.3d 583, 585 (5th Cir. 2006) (internal quotation marks omitted); *see also United States v. Williams*, 822 F.2d 512, 517 (5th Cir. 1987). The presumption in favor of detention pending sentencing is a strong one; § 3143 establishes "high procedural hurdles" that a defendant must clear before being released pending sentencing. *United States v. Abuhamra*, 389 F.3d 309, 320 (2d Cir. 2004). Indeed, the Fifth Circuit has recently recognized that "[t]he decision to detain [the defendant] after conviction is a common one because of the presumption in favor of detention that attaches to a convicted defendant." *United States v. Morrison*, 833 F.3d 491, 506 (5th Cir. 2016).

The defendant has fallen far short of rebutting this presumption by clear and convincing evidence. As the Court has already recognized, the evidence introduced at trial in this case overwhelmingly established that the defendant would be a substantial flight risk if he is released pending sentencing, for a number of reasons.

*First*, the defendant faces the prospect of a lengthy term of incarceration following his conviction on twenty-three counts of the First Superseding Indictment. The crimes of which the defendant has been convicted carry a total potential maximum sentence of 283 years' imprisonment. *See United States v. Stanford*, 341 F. App'x 979, 982 (5th Cir. 2009) (per curiam) (in affirming the pre-trial detention of a fraud defendant, noting that "the district court properly took into account the daunting sentence — 375 years of imprisonment — [the defendant] faces if

3

found guilty . . . in determining that he presents a risk of flight"). Although the defendant's advisory guidelines range is likely to be substantially less than this total potential maximum, a conservative estimate of that guidelines range would still recommend a prison sentence of 168-210 months. It is beyond doubt that the prospect of such a significant term of incarceration provides the defendant with a strong incentive to flee. This is particularly true given that the defendant is 61 years old and thus faces the potential of spending much of the remainder of his life in prison. *See, e.g.*, *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (affirming order of detention pending sentencing in fraud case involving a 70-year-old defendant facing a potential maximum sentence of 150 years, noting that "[a]s to the incentive to flee (based on his age and exposure to a lengthy imprisonment), we consider that such an incentive naturally bears upon and increases the risk of flight"); *United States v. Akingbade*, No. 3:15-cr-164-B, 2017 WL 3582047, at *5 (N.D. Tex. Aug. 18, 2017) (Horan, M.J.) (denying release pending sentencing in a health care fraud case, noting that "[c]onviction of offenses carrying the possibility of substantial prison terms increases any defendant's incentive to flee . . . ."); *United States v. Dimora*, No. 1:10-cr-387, 2012 WL 1409396, at *4 (N.D. Ohio Apr. 23, 2012) (denying motion for release pending sentencing in fraud and bribery case based in part on the fact that the defendant "is facing considerable time in prison").

*Second*, the nature of the defendant's crimes counsels against his release pending sentencing. The jury found that the defendant directed a sprawling, multi-year fraud scheme involving multiple co-conspirators. In order to advance this scheme, the defendant routinely lied to charitable donors in order to obtain donations that he misdirected for personal and campaign purposes. (*See, e.g.*, Gov't Exs. 2010-2z, 2012-2i, 2013-2d, 2013-2j, 2014-2d, 2014-2g). The

defendant also concealed his fraudulent scheme by using a web of sham nonprofit entities and shell bank accounts to launder the fraudulently obtained funds, and by using disposable cellular telephones and cryptocurrency transactions. (*See,* e.g., Gov't Exs. 47, 2014-6i, 2014-7b). When questioned, the defendant attempted to evade detection of his criminal activity by repeatedly lying to the donors, the authorities, and the public. Among other things, the defendant filed false tax returns, caused the submission of false FEC reports and affidavits, issued false press releases, and gave phony donor confirmation letters to law enforcement in response to a grand jury subpoena. (*See, e.g.*, Gov't Exs. 2012-4ee, 2012-4oo, 2012-4pp, 2013-3t, 2013-3v, 2013-3y, 2013-3z, 2013-2j, 2013-27c, 2013-27e, 2014-6m-1, 2014-6r, 2014-7l, 2014-7m).

Put simply, the defendant's extensive criminal conduct has demonstrated that he has no respect for the laws of this country, and no compunction about using lies and deception to advance his own interests, including his interest in being released from custody. The defendant's wide-ranging record of fraud and deceit strongly indicates that the defendant would feel little obligation to comply with conditions of release pending sentencing, and that any assurances by the defendant to the contrary cannot be trusted. *See Dimora*, 2012 WL 1409396, at *3 ("Based upon the evidence in this case, it appears that Dimora's actions over this time period, and the actions taken by his friends at his direction and on his behalf, were calculated to deceive other government employees and the public, and to conceal the criminal activity from the authorities. The Court is unpersuaded that defendant Dimora would not employ similar conduct to elude capture."); *United States v. Nicolo*, 706 F. Supp. 2d 330, 334 (W.D.N.Y. 2010) (denying defendant's motion for release pending appeal in a fraud and money laundering case, noting that the defendant's deceptive conduct over a period of several years showed that he "could not be

trusted to abide by any conditions that might be set on his release").

*Third*, the evidence introduced at trial showed that the defendant has extensive foreign contacts, including in nations where it would be difficult, and perhaps impossible, to locate and extradite him if he fled the United States. Testimony at trial established that the defendant has frequently traveled internationally and has substantial ties to individuals in a number of foreign countries, including Egypt, the Republic of the Congo, and South Sudan. He has also developed high-level contacts in the governments of these countries during the course of his travels. (*See, e.g.*, Gov't Exs. 2013-20d (email from the defendant to General Mohamed El-Assar of Egypt), 2012-5o (email containing proposed letter to be signed by the Congolese health minister)). At the time of the defendant's initial arrest on the criminal complaint in this case, he was attempting to board a flight on an itinerary that would have taken him to the United Arab Emirates, where (according to his statements to law enforcement) he had plans to meet with a prince. Indeed, one of the defendant's business associates from the Republic of the Congo testified at trial that she considered the defendant to be "family," and that the defendant was considered to be a "very important person" in her country given his status as a former congressman. The defendant's extensive history of foreign travel[1] and substantial ties to individuals abroad counsel against

---

[1] According to travel records, the defendant took at least nineteen international flights departing from or arriving into the United States in 2015, and at least eighteen such flights in 2016. These flights included travel to or from Sao Paulo, Brazil; Frankfurt, Germany; Toronto, Canada; Paris, France; Kuwait City, Kuwait; Dubai, United Arab Emirates; Tokyo, Japan; Zurich, Switzerland; Abu Dhabi, United Arab Emirates; Amsterdam, Netherlands; Doha, Qatar; Seoul, Republic of Korea; London, United Kingdom; Cairo, Egypt; Munich, Germany; Athens, Greece; Kiev, Ukraine; Beijing, China; and Shanghai, China. Because this information is outside the trial record, the United States has attached an affidavit concerning this information by FBI Special Agent Spencer W. Brooks. *See* 18 U.S.C. § 3142 (f)(2)(B) (noting that during a hearing concerning pretrial detention, "[t]he rules concerning admissibility of evidence in criminal trials

releasing him from custody prior to sentencing. *See, e.g.*, *United States v. Kachkar*, 701 F. App'x 744, 747 (11th Cir. 2017) (per curiam) (affirming pre-trial detention order in fraud case, concluding that the district court "did not err in concluding that [the defendant's] significant ties and travel to foreign countries weighed in favor of a finding that he was a flight risk") (internal quotation marks omitted).

*Fourth*, the defendant has demonstrated an ability to conceal and launder large quantities of money, and he may have access to financial resources that would enable him to flee. As noted previously, during the course of the scheme the defendant laundered more than $1.2 million through a series of sham charity accounts before diverting the funds to be used for personal and campaign expenses. The defendant has also utilized cryptocurrency such as Bitcoin to transfer funds to at least one of his co-conspirators, and trial testimony established the difficulty of identifying and tracing such cryptocurrency transactions. The defendant contends in his motion for release that he "has no financial resources," (R. Doc. 255, at 2 n.1), but there is no reason to trust this conclusory assertion given the defendant's extensive history of fraud and deceit.[2] *See Madoff*, 316 F. App'x at 59 ("The defendant has argued that all of his assets are accounted for and are inaccessible to him; however, the district court was not required to treat this defendant's financial representations as reliable."). Even if the defendant himself does not presently have access to financial resources, however, he has demonstrated an ability to raise significant funds from other sources. *See Stanford*, 341 F. App'x at 983. Besides the over $1.2 million raised by

---

do not apply to the presentation and consideration of information at the hearing"); *United States v. Abuhamra*, 389 F.3d 309, 321 n.7 (2d Cir. 2004).

[2] Without offering any evidence, the defendant also asserts that "[t]he government seized Mr. Stockman's only bitcoin account that held any funds, and it canceled his credit cards." (R. Doc. 255, at 2 n.1). Counsel for the United States is unaware of any such seizure or cancellation.

the defendant as part of the charged scheme, the defendant also received the funds necessary to hire at least two of his three attorneys at trial from an anonymous "third party benefactor." (*See* Motion to Substitute Counsel, R. Doc. 81, at 1-2). The evidence introduced at trial establishes an ample basis to believe that, if released, the defendant would be capable of raising funds from such benefactors under the guise of funding his further legal defense, while actually intending to use the funds to facilitate his flight from the United States.

*Fifth*, and finally, the defendant has already demonstrated his willingness to use his foreign connections to obstruct the judicial process and escape responsibility for his crimes. Financial records and trial testimony established that shortly after the defendant learned of the FBI's investigation, the defendant sent co-defendant Jason Posey to Cairo, Egypt, for more than two years so that Mr. Posey would be unable to provide law enforcement with information regarding the defendant's criminal activity. Although the defendant makes the remarkable claim that "Mr. Posey's travels were of his own accord," (R. Doc. 255, at 2 n.1), the trial evidence showed conclusively that the defendant personally directed Mr. Posey to travel to Egypt — a country Mr. Posey had never visited, where he knew no one, and where he did not speak the language — in order to obstruct the pending investigation of the defendant's fraud scheme. Mr. Posey testified at trial that when he informed the defendant that he had been contacted by the FBI shortly after his arrival in Egypt, the defendant put Mr. Posey in touch with Benjamin Wetmore, who advised Mr. Posey against further contact with law enforcement. According to Mr. Posey's testimony, the defendant also told Mr. Posey to stay at a facility operated by one of the defendant's Egyptian associates, and directed Mr. Posey to work with Mr. Wetmore to transfer the remaining fraudulent proceeds out of the United States so that those funds could not

be frozen or seized by U.S. authorities. When those funds ran out, the defendant began supporting Mr. Posey with small transfers of Bitcoin and small ATM withdrawals — enough for Mr. Posey to buy food, but not enough to purchase return airfare to the United States. The fact that the defendant sent a key co-conspirator to live in a foreign nation for years during an ongoing criminal investigation and prosecution demonstrates plainly the defendant's willingness to thwart the judicial process to escape punishment for his crimes.

Against this overwhelming evidence of the substantial flight risk posed by the defendant's release on bond, the defendant makes two primary arguments, both of which fall far short of establishing by clear and convincing evidence that he is unlikely to flee. First, the defendant argues that he has not received sufficient medical care during his detention, although he offers no evidence to support these assertions other than his own self-serving statements. The government has asked the defendant's attorneys whether the defendant will sign a written authorization allowing the government to review the defendant's medical records and discuss these issues with medical personnel at the facility where the defendant is detained, but has not received any indication that the defendant will provide such an authorization as of the filing of this response. As a result, the government has not been able to evaluate the accuracy of the defendant's claims, or determine whether any such issues can be remedied through methods other than release from custody.

In any event, however, it is unclear how the defendant's purported medical difficulties can establish that he is not likely to flee if provided bond pending appeal, which is the relevant standard under § 3143(a)(1). *See Kachkar*, 701 F. App'x at 747 (affirming the district court's detention order despite the defendant's complaints that "the federal detention center cannot

properly treat his health issues," noting that the defendant "does not explain why those conditions showed that he was not a flight risk"); *Dimora*, 2012 WL 1409396, at *4 ("[H]ealth problems alone do not necessarily mean that a defendant does not pose a flight risk or a risk of danger to others."); *Nicolo*, 706 F. Supp. 2d at 332 ("[W]hile it does appear that Nicolo suffers from some health problems, that alone does not mean that he poses no flight risk or danger to others."); *United States v. Sudeen*, No. CR-02-062, 2003 WL 21977170, at *1-2 (E.D. La. Aug. 14, 2003) (denying fraud defendant's request for release pending sentencing, noting his "substantial overseas connections" and concluding that "there is no evidence that the defendant cannot obtain necessary medical treatment while in custody"). Similarly here, the defendant's medical complaints do not establish that he is not a flight risk, and they do nothing to undermine the ample trial evidence supporting this Court's detention order. The defendant's own self-serving statements are plainly insufficient to establish by clear and convincing evidence that he is not likely to flee if released.[3]

Second, the defendant has proffered the testimony of six family members, friends, and former campaign workers who believe that he does not pose a flight risk, and he has submitted letters to the Court from each of these individuals. (*See* R. Doc. 255, at 6-8; R. Doc. 255-1).

---

[3] In the event that the Court believes that the defendant's purported medical issues may warrant release pending sentencing, however, the United States would respectfully request an order authorizing it to obtain copies of the defendant's relevant medical records and to speak to medical staff at the detention facility, so that the accuracy of the defendant's assertions can be verified. This request is made out of an abundance of caution, to ensure that the United States remains in compliance with relevant constitutional and statutory requirements. *See* 45 C.F.R. § 164.512(e)(1)(i) (authorizing disclosure of medical records in response to a court order). *But see Caldwell v. Beard*, 324 F. App'x 186, 188 (3d Cir. 2009) (per curiam) (concluding that a prisoner had waived his constitutional right to privacy in his medical information by filing a grievance placing his medical condition at issue); *Walker v. Gerald*, No. 05-6649, 2006 WL 1997635, at * 5 (E.D. La. June 27, 2006) ("A prisoner has no clearly recognized constitutional right in the privacy of his medical records, particularly not in the Fifth Circuit.").

The United States does not doubt that these individuals are well-intentioned, nor does it dispute that they would testify consistent with their letters if called as witnesses at a hearing. Nonetheless, the trial evidence shows that defendant has a demonstrated history of deceiving and manipulating others, including those close to him, in order to further his own interests. *See Dimora*, 2012 WL 1409396, at *3 (declining to rely on affidavits submitted by defendant's friends in support of motion for release pending sentencing, noting that "[g]iven Dimora's willingness to exploit his friends to further his criminal pursuits, the Court finds that there is every reason to believe that he would not hesitate to prevail upon friends to help him flee"). None of the six individuals at issue has seen the entire trial record in this case, and their knowledge of the defendant's activities is therefore limited. With the benefit of the entire trial record, the jury concluded unanimously and beyond a reasonable doubt that the defendant orchestrated a long-running and elaborate scheme to defraud, and the Court concluded that the defendant should be detained pending sentencing. The six letters submitted by the defendant's acquaintances do nothing to rebut the abundant evidence of the defendant's fraudulent conduct, foreign ties, access to financial resources, and willingness to impede the judicial process to evade punishment.

The defendant also argues that he should be released pending sentencing because "it is a routine practice to allow non-violent defendants to remain on release," citing the cases of Edwin Edwards and Bill Cosby. (R. Doc. 255, at 1-2). But the mere fact that other "white-collar" criminal defendants have been permitted to remain on bond pending sentencing does not mean that the defendant is entitled to release. *See Stanford*, 341 F. App'x at 982 (rejecting as a basis for reversing the district court's pretrial detention order the defendant's argument that "other

white collar defendants have been released on bond," noting that the defendant's "comparison with other defendants does nothing to undermine the district court's analysis and is unavailing in any event"). The defendant's motion for release must be decided on its own merits, and the evidence adduced at trial overwhelmingly established that the defendant would pose a serious risk of flight if released. In any event, a passing reference to two other cases is insufficient to satisfy the defendant's burden of proving by clear and convincing evidence that he is unlikely to flee. The defendant is hardly unique in being detained pending sentencing for a nonviolent offense. *See, e.g.*, *United States v. Dailey*, 650 F. App'x 193 (5th Cir. 2016) (per curiam) (affirming the detention pending sentencing of a defendant found guilty of health care fraud); *United States v. Lockett*, 549 F. App'x 269 (5th Cir. 2013) (per curiam) (affirming the detention pending sentencing of a defendant in a tax evasion case); *United States v. Lopez*, 504 F. App'x 297 (5th Cir. 2012) (per curiam) (affirming the detention pending sentencing of defendants in a fraud case).

The defendant's remaining arguments are similarly meritless. The defendant argues that he should be released from custody because he complied with the conditions of his pre-trial release. (R. Doc. 255, at 6). But as many courts have recognized, the mere fact that the defendant complied with the conditions of his release prior to trial is insufficient to carry his burden of establishing by clear and convincing evidence that he is entitled to release following the jury's guilty verdicts, since the defendant's conviction has changed his legal status and increased his incentive to flee. *See Akingbade*, 2017 WL 3582047, at *5 ("[C]ourts routinely discount compliance with pretrial release conditions when deciding on presentencing release because something has changed since trial; [d]efendant is no longer presumed innocent but is

12

guilty of the counts of conviction. His or her legal status has changed, increasing his or her incentive to flee.") (internal quotation marks and alterations omitted); *Dimora*, 2012 WL 1409396, at *4 ("Prior to trial, Dimora had asserted his innocence in the press, and had insisted that he would be exonerated at trial. Now that vindication is no longer available, an important incentive for him to appear in court is gone."); *United States v. Hanhardt*, 173 F. Supp. 2d 801, 806 (N.D. Ill. 2001) ("It is not unusual for persons seeking pre-sentence release to point to their *compliance* with pre-trial release orders as evidence that they will appear for sentencing. The argument is routinely rejected because prior to trial there is the possibility of no imprisonment, which evaporates upon a finding of guilt.") (internal citations omitted); *United States v. Garcia Garcia*, 727 F. Supp. 318, 319 (N.D. Tex. 1989).

The defendant also proposes that he be required to wear an electronic monitoring device, asserting that "the electronic monitoring requirement would rebut any presumption that a defendant might flee." (R. Doc. 255, at 9). Not so. "It is well settled that electronic monitoring, use of GPS device and home detention do not guarantee against flight." *United States v. Khanu*, 675 F. Supp. 2d 69, 74 (D.D.C. 2009) (quoting *United States v. Bergrin*, Crim. No. 09-369, 2009 WL 1560039, at *10 (D.N.J. May 29, 2009)) (internal quotation marks and alterations omitted). "The GPS system of surveillance is imperfect, and even attentive monitoring leaves the possibility of several hours' delay between a defendant's departure and the beginning of an effective search." *Id.* at 75; *see also United States v. Megahed*, 519 F. Supp. 2d 1236, 1244 (M.D. Fla. 2007) ("Neither electronic monitoring nor the GPS system of surveillance defeats the resolute, resourceful, energetic, and non-compliant releasee. Even attentive and persistent monitoring by personnel of Pre-trial Services leaves the possibility of some hours' delay in both

notifying law enforcement of a releasee's departure and beginning an effective search with the aid of a warrant and other essential aids to investigation and pursuit.") (internal citation omitted); *United States v. Benatar*, No. 02-CR-99, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) ("The GPS system, while technologically sophisticated, is ultimately just another form of electronic surveillance, and monitoring equipment is easily rendered inoperative or becomes so by mechanical failure. Furthermore, home detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start.") (internal quotation marks and citation omitted). Given the defendant's extensive history of international travel, significant foreign contacts, and the close proximity to the defendant of an international airport, a few hours' head start is all the defendant would need to depart the United States.

Finally, the defendant argues that he should be released pending sentencing so that he can assist with the raising of funds for his defense and prepare for his sentencing and appeal. (R. Doc. 255, at 10). The defendant cites no authority, and the United States is aware of none, entitling a defendant to release so that he can more effectively fundraise for his legal defense. The defendant's conclusory assertion that it is "extremely difficult, bordering on impossible," for him to meaningfully assist in his defense while incarcerated is also insufficient to justify release. Many defendants are detained pending sentencing and appeal, and the defendant has presented no evidence that the facility where he is housed lacks reasonable accommodations for him to meet with his attorneys and review relevant materials.

## CONCLUSION

The four weeks of trial in this case provided an ample basis for the Court's determination that the defendant has failed to carry his burden of proving by clear and convincing evidence that

he is unlikely to flee pending sentencing. The defendant's motion fails to address this record and offers no new evidence justifying release. The Court should deny the defendant's motion for release pending sentencing.[4]

Dated: May 29, 2018

RYAN K. PATRICK
United States Attorney

Melissa Annis
Assistant United States Attorney

Respectfully submitted,

ANNALOU TIROL
Acting Chief, Public Integrity Section

Ryan J. Ellersick
Robert J. Heberle
Trial Attorneys

  /s/ *Robert J. Heberle*
Robert J. Heberle
Trial Attorney
Public Integrity Section
Criminal Division
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20530
Telephone: (202) 514-1412
E-mail: robert.heberle@usdoj.gov

---

[4] The defendant also asks the Court to disclose to the defense information submitted by the United States *ex parte* "that influenced the Court to remand Mr. Stockman." (R. Doc. 255, at 2 n.1). The United States is unaware of any *ex parte* submission regarding the defendant's bond. Furthermore, it is entirely proper for the United States, out of an abundance of caution, to submit materials to the Court for an *in camera* review and determination regarding their disclosure to the defendant. *See, e.g.*, *United States v. Cruz-Velasco*, 224 F.3d 654, 662 (7th Cir. 2000); *United States v. Patterson*, 809 F.2d 244, 248 (5th Cir. 1987); *In re Eisenberg*, 654 F.2d 1107, 1112 (5th Cir. Unit B Sept. 1981). The defendant has no entitlement to materials determined to be irrelevant and not subject to disclosure. *See, e.g.*, *United States v. Phillips*, 854 F.2d 273, 278 (7th Cir. 1988).

**CERTIFICATE OF SERVICE**

    I certify that on May 29, 2018, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause a true and accurate copy to be sent to counsel of record for defendant Stockman.

                                             /s/ *Robert J. Heberle*
                                             Robert J. Heberle