United States District Court
Southern District of Texas
**ENTERED**
June 13, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § § | |
| VS. | § § § § | CRIMINAL NO. H-17-116-2 |
| STEPHEN E. STOCKMAN | § | |

**ORDER**

A jury convicted Stephen Stockman of 23 felony charges after a four-week trial. (Docket Entry No. 211). Stockman moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, and the government responded. (Docket Entries No. 257, 261).

Under Rule 29, a jury's verdict "will be affirmed 'if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt.'" *United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011) (quoting *United States v. Myers*, 104 F.3d 76, 78 (5th Cir. 1997)). In assessing the sufficiency of the evidence, a court does not "evaluate the weight of the evidence or the credibility of the witnesses, but view[s] the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict." *Id.* "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Anderson*, 174 F.3d 515, 522 (5th Cir. 1999) (quoting *United States v. Burton*, 126 F.3d 666, 669–70 (5th Cir. 1997)).

1

Based on the motion, response, and a careful review of the record and the evidence admitted at trial, the motion for acquittal, (Docket Entry No. 257), is denied. The reasons for this ruling are explained below.

## I. Counts 3, 4, and the Related Money-Laundering Charges

Stockman argues insufficient evidence to support his convictions on counts 3 and 4, which charge mail fraud relating to a $450,571.65 donation by Richard Uihlein to fund postage for a purportedly independent expenditure. Stockman argues that Uihlein knew that his donation would not go toward an independent expenditure because Uihlein knew that Stockman would be involved in the project. Stockman points to trial testimony showing that the letter soliciting the donation, drafted by Kurt Wagner, a Stockman constituent, used "we" and "us" to refer to Wagner and Stockman acting together. Stockman also points to testimony that Uihlein called Wagner to discuss funding for the independent expenditure. Stockman argues that although the evidence may have shown that Stockman was complicit in a coordinated, rather than independent, expenditure, or may have shown an excessive contribution by Uihlein, the evidence did not show that Stockman intended to defraud Uihlein. Stockman argues that, if Uihlein knew about the illegal scheme, Stockman could not have intended to defraud him because he was a knowing participant.

The government points to Uihlein's trial testimony that, when the solicitation was made, he understood that the project would be done independently of Stockman and his campaign:

[Prosecutor]: And did you understand, based on the representations made to you, that the advertising would be done independently of the defendant and his campaign?

[Uihlein]: Yes.

[Prosecutor]: Was that fact important to you when you wrote this check?

2

> [Uihlein]: Yes, it was.
>
> [Prosecutor]: If you had been told that the expenditure would, in fact, be made in coordination with the defendant, would you have written this check?
>
> [Uihlein]: No, I wouldn't.

(Docket Entry No. 192 at 51).

The government also points to evidence showing Stockman's actions to conceal his work with the Center for the American Future, the organization that coordinated the purportedly independent expenditure. Those actions included: directing Jason Posey, the Center's director, to send a letter on Center letterhead to Uihlein soliciting funding for the expenditure; directing Posey to purchase "burner" cell phones to communicate about the project; providing content for the letter Wagner sent to Uihlein; and Wagner's trial testimony that Stockman had told him that the solicitation had to come from someone other than Stockman. (Gov't Exs. 2014-2d, 2014-6i, 2014-2g).

Viewed in "the light most favorable to the government with all reasonable inferences . . . made in support of the verdict," the evidence was sufficient for a jury to reasonably conclude that Stockman intended to defraud Uihlein. *United States v. Terrell*, 700 F.3d 755, 760 (5th Cir. 2012) (internal quotation and alteration omitted). Stockman points to evidence that he argues may support an inference that Uihlein knew that Stockman would have been involved with the advertising project, including using the words "we" and "us" in a fundraising solicitation sent by one of Stockman's constituents who ran a direct-mailing company. The government points to significant conflicting evidence, including Uihlein's own testimony clearly stating that he relied on and believed the representations that the project would be independent from Stockman and his campaign,

3

and that he would not have written the check if he had known that the funds would be used for a project that was not an independent expenditure.

The clear weight of the evidence supported the convictions. The jury credited Uihlein's explanation and description of what Stockman told him and what he knew, believed, and expected as a result. The jury clearly did not believe the evidence that Stockman's counsel cites to make the argument about Uihlein's "real" motive. The evidence in the record was clearly sufficient for the jury to conclude that Stockman intended to defraud Uihlein and supports the verdict on counts 3, 4, and the related money-laundering charges. *See Anderson*, 174 F.3d at 522 ("[T]he jury is free to choose among reasonable constructions of the evidence." (internal quotation omitted)).

## II. Counts 1, 8, and the Related Money-Laundering Charges

Counts 1 and 8 charge mail and wire fraud relating to a separate $350,000 donation by Uihlein for the Freedom House project. Stockman moved for acquittal on these counts and the related money-laundering charges because "these counts rest on Mr. Uihlein's credibility in testifying that (a) his donation was restricted and that (b) he communicated such intent to Stockman." (Docket Entry No. 261 at 4). According to Stockman, although Uihlein's testimony appeared credible, "it must not be evaluated in a vacuum separate and apart from his objectively dubious testimony regarding the ostensible $450,000 independent expenditure" discussed above. (*Id.* at 5).

The government points to Uihlein's trial testimony that Stockman told him that his donation would go toward the Freedom House; that he did not know that the donation would instead go toward Stockman's political campaigns; and that he would not have made the donation if Stockman had told him that any part of the donation would go toward Stockman's political campaigns or

4

personal expenses. (Docket Entry No. 192 at 82–83). The government also points to other evidence, including: a pamphlet Stockman gave to Uihlein that included a photograph of a house and a proposed budget for the Freedom House project, (Gov't Ex. 2013-2d); bank records showing that Stockman used some of Uihlein's Freedom House donation to pay a bonus to a campaign worker, (Gov't Exs. 2013-3a, 2013-3l, 3013-3o-1, 2013-3o-2); and a letter that Posey sent to Uihlein's accountant stating that Uihlein's donation was used to "deliver medical supplies to third world nations and support Freedom House," (Gov't Ex. 2013-2j).

The evidence admitted at trial undermines Stockman's argument that the jury should not have been allowed to weigh Uihlein's credibility on this issue. That evidence was consistent with and amply supported Uihlein's testimony that he believed his donations would go toward the Freedom House, not to Stockman's political campaigns and personal expenses. Stockman asks the court to weigh Uihlein's testimony and find it lacking in credibility, but at this stage, the court may not "evaluate the weight of the evidence or the credibility of the witnesses." *Girod*, 646 F.3d at 313. The evidence is sufficient to support the verdict on counts 1, 8, and the related money-laundering charges.

## III. Counts 2, 5, 7, and the Related Money-Laundering Charges

Counts 2, 5, and 7 relate to Stockman's 2012 solicitations of donations from Stanford Rothschild to the tax-exempt 501(c)(3) organization, Life Without Limits. Rothschild died before trial did not testify. Stockman argues that "[t]he fraud demonstrated at trial was not a cheat on Stockman's part, but a cheat on Mr. Rothschild's part" because Rothschild wanted to donate to Stockman's political campaign through his foundation to avoid paying taxes. (Docket Entry No. 257 at 5). Stockman argues that he solicited donations from Rothschild for campaign-related purposes,

and that those donations were used for Stockman's campaign expenses, even though they were made to a tax-exempt 501(c)(3) organization. Similar to his arguments about Uihlein's donations, Stockman argues, as he did at trial, that he did not intend to deceive Rothschild, but at most was "complicit in helping Mr. Rothschild cheat the IRS while funding his campaign." (*Id.* at 6).

The evidence at trial was sufficient for a reasonable jury to discredit and reject that argument. Stockman sent Rothschild several letters seeking donations for his campaigns, but he directed Rothschild to send the money to the Ross Center and Life Without Limits, both tax-exempt 501(c)(3) organizations, instead of to his campaign committee. One letter stated that "[the Ross Center] along with me desperately need your help. I'm told as long as it's good faith a check can be sent and received." (Gov't Ex. 2012-2i). Attached to that letter was a letter from the IRS approving the Ross Center as a tax-exempt 501(c)(3) organization. (*Id.*). In another letter, Stockman thanked Rothschild for an earlier donation and sought another $52,000 donation to support his primary campaign, stating that "[a]s an accountant I am frugal and watchful that every dollar you invest in our efforts to restore America is used to defeat the left." (Gov't Ex. 2012-3g). At the bottom of the letter, Stockman included instructions to Rothschild to send the funds to Life Without Limits. (*Id.*). In 2013, Stockman sent the Rothschild Charitable Foundation a letter, on Life Without Limits letterhead, confirming receipt of $140,000 in tax-deductible contributions for 2012. The letter stated, "[f]riends like you helped us educate many people last year in traditional American values who otherwise would not have been reached. . . . We are looking forward to educating and motivating American citizens to restore our nation to the Judeo-Christian values and freedoms that made this nation great!" (Gov't Ex. 2012-4ee).

6

The jury also heard evidence about the context and timing of those letters. Rothschild made donations to Stockman in 2010 purported to be for voter-education projects. Ample evidence showed that those funds were not used for voter-education projects, but were instead used for Stockman's personal expenses. Additionally, Rothschild's assistant testified that, when Rothschild made the 2012 donations, his health was declining to the point that she sometimes had to write checks on his behalf. She also testified that, in 2014, Rothschild's charitable organization withdrew his authority to make donations because of concerns about his memory and health. The concerns about Rothschild's memory and health in 2012 undermine Stockman's argument about Rothschild's "improper" motives.

Ample evidence supported the jury's determination that the solicitation letters and the later confirmation letter showed Stockman's intent to deceive Rothschild into thinking that he was donating to charitable organizations, when in fact the money was used for Stockman's campaigns. Although Stockman cites other evidence about his intent, the jury was "free to choose among reasonable constructions of the evidence." *Anderson*, 174 F.3d at 522. The evidence was sufficient to support the verdict on counts 2, 5, 7, and the related money-laundering charges.

## IV. Conclusion

The motion for acquittal, (Docket Entry No. 257), is denied. The evidence was sufficient to support the jury verdict on all of the challenged counts.

SIGNED on June 13, 2018, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge